## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-KA-01689-SCT

*LUKE T. WOODHAM*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/05/1998 |
| TRIAL JUDGE: | HON. SAMAC S. RICHARDSON |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | LESLIE D. ROUSSELL |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | JOHN T. KITCHENS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/29/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/20/2001 |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Luke T. Woodham was indicted on October 20, 1997, in Rankin County for the murder of his mother, Mary Ann Woodham. A five-day jury trial was conducted in Neshoba County following a change of venue. On June 5, 1998, the jury returned a guilty verdict, and Woodham was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. Woodham appeals from this conviction and sentence. Finding no reversible error by the trial court, we affirm Woodham's conviction and sentence.

### FACTS

¶2. On June 5, 1998, Woodham, a sixteen-year-old high school student, was convicted of stabbing his mother to death and sentenced to life imprisonment. At trial, Woodham testified that he had no recollection of killing his mother. He described his relationship with his mother as devoid of love and essentially nonexistent. He recalled his earliest memories of home life while on the stand. These consisted of his parents fighting and finally divorcing when he was in the sixth grade. Woodham testified that he was often left without adult supervision. He never had any close relationships with his extended family, and he described his childhood as lonely.

¶3. At trial, he stated that he had suffered from depression as early as age eight. Classmates picked on him as early as kindergarten; and, according to Woodham, the further he went in school, the more intense the picking, name calling and physical bullying became. In high school, he was indifferent regarding his school work and had to repeat his ninth grade year. He testified that he began to seclude himself from others with the exception of a girlfriend, whom he contended provided him with the love he had waited for all of his life. When the relationship ended, however, he began an emotional downward spiral.

¶4. Grant Boyette, an older high school student, befriended Luke and other unpopular students at school. These students began spending time together--playing video games, reading books and discussing philosophy. At some point, Woodham detailed how the group began dabbling in the occult under the guidance of Boyette. Witnesses testified that Boyette began preaching satanic teachings to the other members of the group, later named "The Kroth."

¶5. At trial, Woodham testified that on the day of his mother's death, he heard Boyette's voice in his head directing him to kill his mother. He recalled the following:

> I remember I woke up that morning, and I had seen the demons I'd seen all the time when Grant had told me to do something. And he was telling me that I was nothing and that I'd always be nothing; . . . And I remember getting the knife, and I got a pillow. And I walked into my mother's room. And I remember Grant's voice and he told me that I had to do all of this. . I remember I just closed my eyes, and I just followed myself. I didn't want to do any of it. . . I kept hearing his voice. And my eyes were closed. When I opened them, my mother was lying on her bed dead.

¶6. Lucas Thompson, a classmate of Woodham, testified that the night prior to the homicide, Woodham told him in a telephone conversation that he was going to kill his mom the next day with a knife. Thompson did not believe him; however, when they spoke again the next morning, Woodham, who was on the other phone line with Boyette, informed Thompson that he had in fact done it.

¶7. Woodham's blood and the blood of his mother were found on a butcher knife removed from the crime scene. Dr. Steven Hayne, the State's pathologist and author of Mary Woodham's autopsy, detailed her injuries:

> There were multiple types of injuries. Specifically there was evidence of blunt force trauma. There was evidence of multiple slash wounds. There was evidence of multiple stab wounds. In fact a total of seven stab wounds were identified, and eleven slash wounds were noted during the course of the autopsy. In addition, there were superficial injuries consisting of scratches or abrasions located on multiple surfaces of the body. There was also one small cut located over the front of the left arm. And there was also areas of bruising located predominantly over the right side of the face.

He concluded that the ultimate cause of death was attributable to "three stab wounds of the chest, to include a stab wound of the heart, a stab wound of the right lung, a stab wound of the left lung, and the subsequent collection of a large volume of blood bleeding into the chest cavity to a volume of approximately three quarts of blood...."

¶8. Shortly after Woodham was taken into custody and mirandized, an investigator observed a large cut on Woodham's hand and asked him how he had cut his hand. Woodham paused for a moment and responded, "Killing my mom." A jail administrator testified he also asked Woodham the same question and received the same answer. Investigators obtained written and video recorded statements from Woodham. In their presence, Woodham signed a waiver of rights form, a video release form and a form styled "Voluntary Statement" in which he confessed to killing his mother. In the "Voluntary Statement" Woodham wrote the following:

> I woke up this morning, got a butcher knife, and a pillow. I got into my mother's room at about 5:00 a.m. I put the pillow over her head and stabbed her.

He further explained in a videotaped confession that killing his mother was the only way that he could get the gun and the car.

¶9. A jury convicted Woodham of murder on June 5, 1998. He was sentenced to life imprisonment. Aggrieved by the jury's verdict, he has timely filed this appeal.

## ANALYSIS

¶10. Woodham raises four issues on appeal. First, he argues that the trial court erred in not allowing defense counsel to further question two witnesses called by the defense following the witnesses' invocations of their Fifth Amendment right not to incriminate themselves. Second, Woodham asserts that he was denied due process of law when the trial court admitted his written and videotaped confessions into evidence following its determination that his waiver of his *Miranda* rights was valid. Third, he contends that the trial court committed reversible error when it refused proposed defense jury instructions D-5, D-6, D-9, D-10, D-11(A). The fourth argument advanced by Woodham is that the evidence of his legal insanity was so great that any reasonable jury could not have found him sane beyond a reasonable doubt.

### I. WHETHER THE TRIAL COURT ERRED IN NOT ALLOWING DEFENSE COUNSEL TO FURTHER QUESTION WITNESSES FOLLOWING THEIR INVOCATIONS OF THEIR FIFTH AMENDMENT RIGHT NOT TO INCRIMINATE THEMSELVES?

¶11. During his case in chief, Woodham called Grant Boyette, who was indicted for crimes arising out of the same occurrence, to testify. Under the direction of his attorney, however, Boyette invoked his Fifth Amendment rights immediately after taking the stand. The following dialog occurred:

**Q**: **Roussell (Counsel for Woodham):** Would you please state your name for the record?

**A:** Marshall Grant Boyette.

**Mr. Rainer: (Counsel for Boyette):** Your Honor, that is the extent of which I am going to allow my client to testify. I am directing him, under these circumstances, to invoke his privilege and right-privileges and rights under the Fifth Amendment to the Constitution of the United States and Article 26 of the Mississippi Constitution. And I'm directing him not to answer any questions put to him by Defense Counsel.

**Q: (Roussell):** Do you know Luke Woodham?

* * *

**A: (Boyette Counsel):** Due to the circumstances - All I can say is, again, I am directing my client not to answer any questions. I am directing him not to say another word.

**The Court**: Mr. Boyette-Mr Boyette, are you invoking your right under the Fifth Amendment to answer any further questions.

**A: Mr. Boyette:** Due to the circumstances of the situation, I've been advised by my attorney to invoke my Fifth Amendment rights.

**The Court:** Mr. Roussell, it appears that he will invoke his Fifth Amendment rights as to further questions

**Q:(Roussell):** Am I to understand that you will answer no questions based on the Fifth Amendment?

**Mr. Rainer:** You are to understand that, and I am directing my client not to say another word.

¶12. At a bench conference, Woodham informed the Court that he intended to ask Boyette whether he was present at the Woodham's home the day his mother was killed. The court ruled it improper, however, suggesting that to ask questions before the jury once Boyette invoked his Fifth Amendment rights would amount to the attorney testifying.

¶13. After calling Boyette, Woodham called Lucas Thompson, who had previously testified for the prosecution, to the stand. He attempted to cross-examine Thompson on several subjects relevant to Woodham's state of mind, but the following took place:

**Court:** Mr. Thompson, before you assume the stand, I remind you, sir, that you are still under oath, as you have been previously sworn by this Court in this trial.

**Q: Roussell**: Mr. Thompson, why are you refusing to testify when you agreed to testify earlier.

**A**. **Thompson (reading):** Upon advice of retained counsel and due to the breach of Rankin County youth Court division Order of October 15, 1997, requiring confidentiality as to my interests and the violation of my due process of law by media disclosure through its motion filed herein, I hereby invoke my rights under the United Sates Constitution Fifth Amendment to decline to testify as such may tend to incriminate me." (R. 426).[1]

\* \* \*

**Q: Roussell:** And as I understand the court's ruling, I can ask him no further questions?

**Court**: Yes, sir. Are you invoking your Fifth Amendment rights as to any and all questions that would be asked subsequent to your name?

**A: (Thompson Attorney):** Yes, sir.

**A: Thompson:** Yes, sir.

**Court:** That's the ruling of the court, Mr. Rousell.

**A. Mr. Roussell**: Yes, sir. I just for the record, object to that ruling.

¶14. Woodham argues it was reversible error for the Court to refuse further questioning of Boyette and Thompson because he had a right to *call and question* both witnesses even after they took the stand and invoked the privilege against self-incrimination. There are many questions, he submits, that could have been asked which would have furthered his insanity theory without prejudicing the witnesses. He identifies only one such question--that he intended to ask Boyette whether he was present in the Woodham's home the day Mary Woodham was killed. Nothing in the record, however, suggests Boyette's presence, and defense counsel did not outline other questions and expected answers. Thus, except for the one question concerning

Boyette's presence, he did not properly preserve the matter for appeal, affording this Court the opportunity to determine if any questions were outside the Fifth Amendment privilege. *See* **State v. Cecarelli**, 631 A.2d 862, 867 (Conn. App. Ct. 1993); **State v. Ramsey,** 576 P. 2d 572, 575 (Idaho 1978). *See also* **Evans v. State**, 725 So. 2d 613, 669 (Miss.1997) (if testimony is excluded at trial, record must be made of proffered testimony in order to preserve point on appeal); **Russell v. State**, 607 So. 2d 1107, 1114 (Miss. 1992). This issue is therefore without merit.

¶15. The State submits that a blanket claim of the privilege is proper where the proceeding is criminal in nature and the record affirmatively reflects (1) the witnesses are potential accessories to the same crime; (2) the witnesses upon the advice of their lawyers, would have invoked their Fifth Amendment privilege to each and every specific question, and (3) the trial judge has sufficient information to determine, in fact, that answering any questions at all about the offense would tend to incriminate the witnesses. Both Boyette and Thompson were potential defendants in pending cases here, -- Boyette had been indicted for accessory to murder and Thompson had been charged in youth court. We hold, therefore, that they were entitled to Fifth Amendment protection and that there was no error here as there was no question proffered which would be outside the scope of that privilege.

### II. DID THE TRIAL COURT DENY WOODHAM DUE PROCESS OF LAW WHEN IT DETERMINED THAT WOODHAM'S WAIVER OF HIS *MIRANDA* RIGHTS WAS VALID?

¶16. Woodham gave two confessions after his arrest, but asserts they should not have been admitted into evidence because they were not voluntarily given. Specifically, he argues his due process and Sixth Amendment rights were violated because he was too young to knowingly and intelligently waive his *Miranda* rights. He cites **In re W.R.A.**, 481 So. 2d 280 (Miss. 1985), where the age, the mental state at the time of confession, experience and guidance, if any, were considered in evaluating the confessions of a minor.[2] Because he asserts he was in a state of shock, depression, and emotional instability at the time of his statements, coupled with the fact that he had no guidance such as an attorney present, Woodham argues that he was unable therefore to form the requisite intent to knowingly and intelligently waive his rights. We disagree.

¶17. This Court has reiterated that the "totality of circumstances" approach should be used in determining the admissibility of confessions, whether they come from minors or adults. **Woodham v. State**, 779 So. 2d 158, 161 (Miss 2001)(citing **Fare v. Michael C.**, 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)). We have observed:

> The **Fare** Court stated that the totality of the circumstances test provides greater flexibility to the trial court in determining the admissibility of confessions from juveniles by taking into consideration the age and experience of the child. For example, a minor may have had a significant amount of experience with the court system and knowledge of his legal rights, while another may have no experience at all. *See also* **In re Interest of W.R.A.**, 481 So.2d 280, 285-86 (Miss.1985). The age of the minor is seldom per se conclusive in deciding whether a confession was freely and voluntarily given. *Id*. at 286.

779 So. 2d at 161. *See also* **In re W.R.A.**, 481 So. 2d at 286. Although Woodham was sixteen with no prior experience with the authorities, the record reflects he was Mirandized at least three times on the morning of October 1, 1997, by the arresting officer, Roy Dampier; by Officer Hirschfield when he was

driving him to the police department; and a third time at the police department by Officer Hirschfield. Woodham was asked by these two officers, if he understood his rights, and each time he responded that he did. He was given a waiver of rights form, containing a standard *Miranda* warning and followed along as the officer read it aloud. He also initialed the form twice, once indicating that he understood his rights and once indicating that he wished to give a statement at that time. The officers described Woodham's demeanor at the time of his arrest and detention as calm.

¶18. The record also reflects that Woodham was not a person of low intellectual abilities. In his descriptions to the jury, he explained how he enjoyed reading philosophical works, such as Nietzsche, Aristotle, and Plato as well as classic literature by Dostoyevsky. He also conveyed his thoughts in several writings, including poetry and songs and at one point during cross-examination, he even told the prosecuting attorney, "Sir, I don't know if I murdered her. And so stop trying to get me to incriminate myself." This Court, further, has previously rejected the proposition that a minor cannot validly waive the right to remain silent. *Clemons v. State*, 733 So.2d 266, 269 (Miss. 1999). Although Woodham is young, his intellectual abilities coupled with the number of times he was read his *Miranda* warnings by officers and his subsequent indications that he understood them, we conclude that the trial court's finding that Woodham knowingly and voluntarily waived his rights on the day in question should not be disturbed.

### III. DID THE TRIAL COURT ERR WHEN IT REFUSED THE PROPOSED DEFENSE JURY INSTRUCTIONS D-5, D-6, D-9, D-10, D-11(A)?

¶19. Woodham asserts that the trial court erred in refusing defense proffered jury instructions regarding insanity and manslaughter. Insanity, Woodham's defense theory, was submitted to the jury in instructions S-10[3] (the verdict form for finding not guilty by reason of insanity), D-12(A)[4] (defining insanity), and C-3[5] (instructing the jury on the State's burden).[6] Woodham, however, challenges the court's refusal of Jury Instruction D-11A, which reads as follows:

> The Court instructs the jury that if you find from the evidence in this case that the State of Mississippi has proved each of the essential elements of the crime of murder or manslaughter, beyond a reasonable doubt, then you must next discuss among yourselves whether or not the State of Mississippi has proved the sanity of the defendant beyond a reasonable doubt.

> Before you are allowed to return a verdict of guilty you must be satisfied that the State of Mississippi has proved the following beyond a reasonable doubt:

> That Luke Woodham, at the time of committing the act for which he is accused (if indeed you find that he committed said act) was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing, or (2) if he did know the nature and quality of the act he was doing, that he did not know that what he was doing was wrong.

> If after considering all of the evidence in this case you find that the State of Mississippi has failed to prove, beyond a reasonable doubt, the sanity of Luke Woodham, then your verdict must be "not guilty by reason of insanity. [sic]

¶20. As the State points out, this instruction is confusing, contradictory and misleading. It requires in one breath (the 3rd paragraph) that the State prove Woodham's *insanity* beyond a reasonable doubt and in the next breath (the 4th and final paragraph as well as the 1st paragraph) that the State prove his *sanity* beyond

a reasonable doubt. Apparently, the word "not" should have been supplied between the words "was" and laboring" in the third paragraph of D-11A.

¶21. Despite Woodham's arguments that D-11A should have been granted, the record reflects that the Court did instruct the jury on the defense's theory of insanity in D-10 (the verdict form for finding not guilty be reason of insanity) D-12(A), (defining insanity), and C-3 (D-13) (instructing the jury on the State's burden). Accordingly Woodham was able to argue the theory of insanity to the jury. This Court has repeatedly stated that "when considering a challenge to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instructed." *Burton ex rel. Bradford v. Barnett*, 615 So. 2d 580, 58 (Miss. 1993). "[I]n determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Coleman v. State*, 697 So.2d 777, 782 (Miss. 1997) (quoting *Collins v. State*, 691 So.2d 918 (Miss. 1997)). In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results. There was no error here.

¶22. Woodham further asserts that he was entitled to have the jury instructed on manslaughter. In Mississippi, manslaughter and murder are distinguished by the element of malice aforethought or deliberate design. *Agnew v. State*, 783 So. 2d 699, 703 (Miss. 2001). He contends that there was enough evidence to raise a question of fact as to whether he had the mental capacity required to develop deliberate design. Instructions D-5[7] and D-6[8] dealt with manslaughter, and D-9 and D-10 were verdict forms that included manslaughter.

¶23. A defendant is entitled to present his theory of the case to the jury if it is supported by the evidence and contains a correct statement of the law. As such, he is entitled to have the jury instructed as to this theory. This Court has repeatedly stated that:

> [a] lesser-included offense instruction should be granted unless the trial judge and ultimately this Court can say, taking the evidence in the light most favorable to the accused and considering all the reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant, guilty of a lesser-included offense (conversely, not guilty of at least one essential element of the principal charge).

*Greenlee v. State*, 725 So. 2d 816, 823 (Miss. 1998) (quoting *Harper v. State*, 478 So. 2d 1017, 1021 (Miss. 1985)).

¶24. In fact, our case law favors lesser-included offense instructions being given to the jury. *Agnew*, 783 So. 2d at 703. In *Agnew*, we noted that "the jury should be given the option of a lesser-included offense where there is *any* evidentiary basis [for it]." *Id*. (citing *Russell v. State*, 729 So. 2d 781, 787 (Miss. 1997)). Despite this fact, such an instruction should not be given automatically. *Id*. (citing *Mease v. State*, 539 So. 2d 1324, 1329 (Miss. 1989)). A lesser-included offense instruction "should only be given after the trial court has carefully considered the evidence and is of the opinion that such an instruction is justified by the evidence." *Id*. (quoting *Mease*, 539 So. 2d at 1329); See also *Greenlee*, 725 So. 2d at 823 ("The evidence must warrant an instruction on the lesser-included offense before it can be granted.").

¶25. This Court has noted that "[j]ury instructions should be given only if they are applicable to the facts developed in the case being tried." *Walker v. State*, 740 So. 2d 873, 888 (Miss. 1999) (quoting

*Lancaster v. State*, 472 So. 2d 363, 365 (Miss. 1985)). Further, "[t]o grant an instruction that is not supported by the evidence would be error." *Id*. Generally, "[a] defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *[Humphrey v. State](#)*, 759 So. 2d 368, 380 (Miss. 2000) (quoting *Heidel v. State*, 587 So. 2d 835, 842 (Miss. 1991)).

¶26. Woodham finds the evidentiary basis for a manslaughter instruction in his own testimony and that of Dr. Mick Jepsen, expert witness for the defense. To the contrary, close scrutiny of the record reveals that when considering all of the evidence below, including the testimony of these two witnesses, murder with malice aforethought and not guilty by reason of insanity were the only viable theories supported by the evidence. During the opening and closing statements, not guilty by reason of insanity was absolutely the only theory suggested by defense counsel. As Woodham's counsel stated in his opening, "You're going to hear from a Dr. Mick Jepsen. You're going to hear that Luke Woodham was suffering from a mental disease and he didn't appreciate the nature and quality of his acts." As this was the only defense that was arguably supported by the evidence, the trial court was under no obligation to instruct as to other *possible* theories. See *[Tran v. State](#)*, 681 So. 2d 514, 520 (Miss. 1996) (Finding that in a prosecution for murder "[w]here the only theory of defense was self-defense and the jury was properly instructed thereon, there was no requirement that the court instruct as to other possible theories.") (citing *Smith v. State*, 572 So. 2d 847, 849 (Miss. 1990)).

¶27. Woodham focuses on his own testimony, particularly his statements regarding closing his eyes and later opening them to find his mother dead, to find evidence supporting manslaughter. However, there was testimony below that he told a friend that he planned to kill his mother the day before the murder. In a written statement for the police after his arrest, Woodham wrote: "I woke up this morning, got a butcher knife and a pillow. I got into my mother's room at about 5:00 a.m. I put the pillow over her head and stabbed her." He stated in his videotaped confession that he killed his mother in order to get the car and gun. Further, there was testimony that Woodham brutally used both an aluminum bat and a knife on his mother, and that the actual events of that day began in the kitchen hallway and ended in the master bedroom. The record reveals that Woodham never offered any mitigating evidence that would justify a manslaughter instruction. Here, an imperfect insanity defense is the only thing arguably supported by the evidence below. There was no evidence presented that would support a verdict of manslaughter.

¶28. There was no evidentiary basis in the record to permit a jury to rationally find Woodham guilty of manslaughter. Thus, the trial court judge correctly denied the request for an instruction on manslaughter.

### IV. WAS THE EVIDENCE OF WOODHAM'S LEGAL INSANITY SO GREAT THAT ANY REASONABLE JURY COULD NOT HAVE FOUND HIM SANE BEYOND A REASONABLE DOUBT?

¶29. Mississippi still follows the *M'Naghten* test for determining a person's sanity at the time of the crime. *Russell v. State*, 729 So.2d at 784 (citing *Westbrook v. State*, 658 So.2d 847, 850 (Miss.1995); *Tyler v. State*, 618 So.2d 1306, 1309 (Miss. 1993); *Roundtree v. State*, 568 So.2d 1173, 1181 (Miss. 1990); *Davis v. State*, 551 So.2d 165, 173 (Miss. 1989)). Under the *M'Naghten* test, it must be proved that at the time of committing the act that the accused "was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he

did not know that what he was doing was wrong." ***Roundtree***, 568 So.2d at 1181 (citations omitted). Essentially, the test is whether the accused did not know right from wrong at the time of committing the act. ***Russell***, 729 So.2d at 784 (citing ***Roundtree***, 568 So.2d at 1181). The determination of a defendant's sanity is within the province of the jury, which may accept or reject expert and lay testimony. ***Tyler***, 618 So. 2d at 1309; ***Roundtree***, 568 So. 2d at 1181.

¶30. Both Woodham and the State offered experts in forensic psychology and psychiatry to testify to Woodham's state of mind at the time of the shooting. While defense expert Jepsen suggested Woodham suffered from a severe borderline personality disorder and a distorted reality leaving him helpless "to judge the appropriateness of his behaviors, to appreciate the implications of his conduct, or to conform those conducts to the requirements of the law," the State's experts, in contrast, concluded that Woodham was able to understand the nature and quality of his actions and the difference between right and wrong. For example, a State expert, Dr. Chris Lott, pointed to Woodham's statements the day of the offense that he killed his mother in order to get the gun and the car; to his conversation with Lucas Thompson the night before informing him that he was going to kill his mother the next day; and, to the fact that there was no history of severe mental illness, or evidence indicating that he was exhibiting bizarre behavior with anyone, or suffering from a psychotic disorder. It was his opinion, in fact, that Woodham was malingering or fabricating the psychotic symptoms.

¶31. The issue of a defendant's sanity is an issue for the jury to determine, and its finding will not be reversed if it is supported by substantial evidence. ***Woodham***, 779 So. 2d at 163. ***Davis v. State***, 551 So. 2d at 173. The jury, when presented with the competing testimonies of the experts, did not find the evidence supported a finding of insanity. The verdict of the jury should not be overturned.

## CONCLUSION

¶32. There was no error in the trial court's decision to halt defense counsel's questioning of Boyette and Thompson following their assertion of their Fifth Amendment rights. Both witnesses were entitled to such protection, and defense counsel failed to preserve any questions for appeal that might have fallen outside of such privilege. Woodham's waiver of his ***Miranda*** rights was valid under the totality of the circumstances. Thus, the trial court did not err in admitting both his written and videotaped confessions. Third, there was no error in the trial court's refusing to instruct the jury on the proffered defense instructions. The jury was properly instructed on the defense of insanity, and Woodham was not entitled to a manslaughter instruction. Finally, a reasonable jury could have found that Woodham was legally sane at the time of the crime as there was conflicting evidence on that issue.

¶33. Finding no reversible error in the issues raised by Woodham, we affirm the judgment of the Rankin County Circuit Court.

¶34. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

> **PITTMAN, C.J., WALLER, COBB, DIAZ, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY.**

1. Thompson was permitted to state his name for the record.

2. The State asserts that Woodham objected to the confessions because he was a minor and "he didn't have

anyone present there to explain his rights to him and to help him understand his rights." The record reflects that other grounds for objection included voluntariness, equal protection, and due process.

3. S-10 reads:

> The Court instructs the jury, that when all (12) twelve of you reach and agree upon a verdict, you shall return your verdict to the Court in one of the following forms:
>
> 1. Should you find the defendant, guilty of murder, then return your verdict as follows:
>
> We the jury, find the defendant, Luke Woodham , guilty of murder.
>
> 2. If you find the defendant not guilty by reason of insanity, then state your verdict in one of the following forms:
>
> a. We the jury find the defendant not guilty be reason of insanity, and we find that the defendant had since been restored to reason
>
> Or
>
> b. We the jury, find the defendant is not guilty be reason of insanity, and we find that he has not been restored to his reason and is dangerous to the community.
>
> 3. If you find the defendant not guilty of murder, then state your verdict as follows:
>
> We the jury find defendant, Luke Woodham, not guilty.
>
> Write your verdict on a clean sheet of paper. It is not necessary that you sign the verdict.

4. D-12A reads: "The Court instructs the jury that the following is the definition of insanity in Mississippi: Insanity exists when at the time of committing of the act the accused was laboring under such defect of reason from disease of mind as (1) not to know the nature and quality of the act he was doing, or (2) if he did not know the nature and quality of the act, he did not know what he was doing wrong."

5. C-3 reads: "The Court instructs the jury that once the defendant places evidence of the defendant's lack of sanity before the jury, it becomes the burden of the State of Mississippi to prove the sanity of the defendant beyond a reasonable doubt before the defendant can be found guilty."

6. "The Court instructs the jury hat [sic] if you believe that the state has failed to prove any one of the elements of the crime of murder beyond a reasonable doubt, then you must find the defendant not guilty of the crime of murder and then you may proceed with your deliberations to decide whether or not the state has proved beyond a reasonable doubt all of the elements of the lessor [sic] included offense of manslaughter."

7. "The Court instructs the jury hat [sic] if you believe that the state has failed to prove any one of the elements of the crime of murder beyond a reasonable doubt, then you must find the defendant not guilty of the crime of murder and then you may proceed with your deliberations to decide whether or not the state has proved beyond a reasonable doubt all of the elements of the lessor [sic] included offense of manslaughter."

8. "The Court instructs the jury that if the evidence warrants it, you may find the defendant guilty of a crime lesser than murder. However, notwithstanding this right, it is your sworn duty to accept the law as given to you by the Court."