CHANDLER, J.,
for the court.
¶ 1. Rannell Lewis was convicted in the Madison County Circuit Court of kidnap-ing and sentenced as a habitual offender to life imprisonment in the custody of the Mississippi Department of Corrections. He now appeals to this Court, asserting fifteen assignments of error. Several of the issues he raises are waived or other *823 wise procedurally barred. Moreover, there is no merit to the remaining issues before us. Accordingly, we affirm the jury’s finding that Lewis was guilty of kidnaping.
FACTS
¶ 2. This case arises from the April 12, 1998, kidnaping of Belhaven college student Christi Tucker. The record reflects that Tucker began her morning exercising in the Belhaven neighborhood. As she reached a secluded area in the neighborhood, she was approached by a large, black male who was standing outside a dark green Mazda. Tucker testified that he was clean cut and wearing a gray sweatshirt and dark pants. She stated that the man greeted her and asked her how she was doing; she responded “fine” and continued walking up the street. Seconds later, the man grabbed her from behind.
¶ 3. Tucker struggled with the man for several minutes. At one point she fought free from her assailant’s grasp and fell to the ground, scraping her knee and elbow. Tucker even managed to open a can of pepper spray, although she testified that her attacker grabbed it from her hand before she could fully release its contents. Ultimately, however, the man overpowered Tucker, hit her in the face, and locked her into the trunk of his vehicle.
¶ 4. While in the trunk of the vehicle, Tucker saw an electric guitar and a hammer. Tucker grabbed the hammer and began pounding on the trunk’s latch. After about five blows the latch broke and the trunk opened. By this time Tucker’s kidnapper had exited the Belhaven neighborhood and was driving north on Interstate 55. He was weaving in and out of traffic at approximately eighty miles per hour.
¶ 5. Several people witnessed Tucker in the trunk of the vehicle including Anthony Baldwin who testified that even before the trunk opened he became suspicious of the speeding vehicle because of a piece of cloth extending from the trunk over the license plate. Likewise, Merle Stribling witnessed Tucker in the trunk of the vehicle but dismissed the situation as a few kids playing a prank. Stribling quickly changed her conclusion when she witnessed Tucker jump from the speeding vehicle.
¶ 6. Tucker testified that “finally we got so far in front of those cars that I didn’t know where we were going, and we were right past north of the Madison exit, and I realized that’s getting into the country where there’s really no cities and no civilization.” At that moment she jumped from the trunk of the vehicle onto the highway. It was estimated that the vehicle was going eighty miles per hour at the time Tucker jumped. Immediately, several cars stopped including one driven by Mary McBride who witnessed Tucker jump from the speeding vehicle. McBride identified the vehicle as a dark green Mazda. McBride testified that the first officer arrived on the scene within five minutes of the incident.
¶ 7. Kim Layton, a police dispatcher for the Madison Police Department, testified that a witness to the incident called 911 and reported that a distressed girl had been flagging people down from the trunk of a car; the car, according to the caller, was green with a “gold package.” Layton recorded the call and passed the information to the Madison County Sheriffs Office which requested all officers and deputies to “be on the lookout” for a green Mazda 626 occupied by a black male. Mark Holland, an officer with the Flora Police Department, was patrolling the Flora area at the time the statement was issued. Shortly thereafter he noticed a dark green Mazda being driven by a black male. Officer *824 Holland followed the vehicle until it left the city limits and initiated a stop.
¶ 8. Officer Holland testified that he immediately noticed the dented trunk. At this point Officer Holland pointed his gun at the driver and ordered him to exit the vehicle. Holland then placed the individual in handcuffs.
¶ 9. The suspect, Rannell Lewis, was wearing a grey sweat shirt and blue jeans. Officer Holland noticed there was blood on Lewis’s shirt. Furthermore, investigators discovered a guitar matching the one described by Tucker and spots of blood on the trunk and window. Lewis was subsequently charged with kidnaping.
¶ 10. During the trial, Lewis testified in his own defense. He did not deny that his vehicle was the one used during the abduction. Instead, Lewis testified that the evening before the kidnaping he and a friend consumed a modest amount of marijuana, crack-cocaine, and bourbon until he passed out in a hotel room. By the time Lewis awoke, his friend had gone but Lewis’s car was parked outside. Immediately after he awoke, Lewis took his car and began driving to Yazoo City. He stopped for some water in Flora, where Officer Holland arrested him. Lewis theorizes that someone took his car, committed the crime, returned the car and Lewis awoke just at that moment and started on his trip to Yazoo City.
LAW AND ANALYSIS
I. WHETHER THE TRIAL COURT ERRED WHEN IT OVERRULED LEWIS’S OBJECTIONS TO QUESTIONS ASKED BY THE STATE DURING VOIR DIRE
¶ 11. ' In his first assignment of' error, Lewis asserts that the trial court authorized the State to begin making its opening statement during voir dire. Lewis contends that all issues pertaining to voir dire are governed by the Uniform Rules of Circuit and County Court Practice 10.01, 10.02, and 10.03.
¶ 12. The purpose of voir dire is to select a fair and impartial jury. Cotton v. State, 790 So.2d 235, 238(¶ 4) (Miss.Ct.App.2001). Accordingly, “[o]ur law allows an attorney for either side to prove the prejudices of the prospective jurors to the end that all will understand the jurors’ thoughts on matters directly related to the issues to be tried.” West v. State, 553 So.2d 8, 22 (Miss.1989). Considerable discretion is vested in the trial court “in passing upon the extent and propriety of questions addressed to potential jurors.” Crosby v. State, 760 So.2d 725, 726(¶ 6) (Miss.2000). This Court will find that the trial court abused its discretion only “where a defendant shows clear prejudice resulting from undue lack of constraint on the prosecution.... ” Jackson v. State, 791 So.2d 830, 835-36(¶ 21) (Miss.2001).
¶ 13. Lewis complains of the following passage that occurred during voir dire:
State: The State expects to call approximately 20 witnesses on its case in chief. It’s going to take me a while, but I’m going to run through them one by one and see if any of you know or are related to any of the witnesses involved. What happened on the 22nd is Christi Tucker was abducted in the Belhaven area, as the Judge told you. She was transported to Madison County to the area of the city of Madison, and just north of the Madison exit, she jumped out of the trunk.
Lewis: Your honor; I object. That sounds like opening statement. If he has a question for panel, I would ask that he asks it.
*825 Court: Overruled. It appears to the Court he’s trying to set up his list of witnesses. So be brief with it....
In support of his argument, Lewis cites the Uniform Rules of Circuit and County Court Practice 10.01, 10.02, and 10.03; however, absent this general citation, Lewis fails to demonstrate how these rules limit the scope of voir dire. As the State demonstrates, not one of these rules prohibits counsel from setting out the general disposition of the facts in order obtain a fair and impartial jury. We agree with the trial court and hold the factual underpinnings of the case described by the prosecution during voir dire were necessary to set the stage for questioning each potential juror about their relationships with the case and its many witnesses. Counsel made correct use of the voir dire process in a valid attempt “to ascertain whether there [was] ground for a challenge of a juror for cause, or for a peremptory challenge.” Tighe v. Crosthwait, 665 So.2d 1337, 1341 (Miss.1995). Furthermore, Lewis makes no attempt to show how the prosecution’s statements during voir dire prejudiced his case. See Jackson, 791 So.2d at 835-36 (¶ 21). As such, we find no merit in Lewis’s argument.
II. WHETHER THE TRIAL COURT ERRED WHEN IT DENIED LEWIS’S MOTION TO QUASH THE ENTIRE JURY VENIRE
¶ 14. Lewis argues that the trial court erred by not quashing the entire venire when it became apparent that out of the thirty-nine potential jurors, only two were black, and neither was seated as a juror. However, rather than asking for relief and offering proof that the jury selection process in Madison County was and continues to be biased, Lewis requests that this Court instruct the Attorney General to oversee a study to determine if the system for selecting potential jurors is actually random at all. We find such a request unjustified and unsupported by authority; however, given the nature of Lewis’s claim, we will address the issue of the jury’s makeup that convicted Lewis.
¶ 15. The Sixth Amendment to the United States Constitution requires that all defendants be tried in front of a fair and impartial jury. However, the terms fair and impartial have never been synonymous with most favorable. As the Mississippi Supreme Court has held, “[ajlthough the defendant does have a right to be tried by a jury whose members were selected pursuant to a nondiscriminatory criteria, ... the Sixth Amendment to the Constitution of the United States has never been held to require that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population.” Britt v. State, 520 So.2d 1377, 1379 (Miss.1988). See also Gavin v. State, 767 So.2d 1072, 1077(¶ 12) (Miss.Ct.App.2000).
¶ 16. In Lanier v. State, 533 So.2d 473 (Miss.1988), the Mississippi Supreme Court enumerated the requirements necessary for a defendant to prove a violation of the fair cross-section requirement for an impartial jury:
(1) the group alleged to be excluded is a “distinctive” group in the community;
(2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
(3) this under representation is due to systematic exclusion of the group in the jury selection process.
Lanier, 533 So.2d at 477. In rejecting the defendant’s claim, the court in Lanier noted that the defendant offered no proof that the county’s method of drawing veniremen was discriminatory. Id. Here, Lewis sets *826 out proof for the first and second elements stated in Lanier, arguing that the excluded jurors were black and that the percentage of black persons in Madison County-far outweighed the percentage of black persons comprising the jury venire. However, rather than prove the third element, Lewis asks this Court to assume that the low representation of black persons is part of a systematic discriminatory practice within Madison County until the State proves otherwise. Therefore, just like the defendant in Lanier, Lewis offers no proof that Madison County’s random jury selection process was discriminatory; therefore, Lewis’s assignment of error is without merit.
III. WHETHER THE TRIAL COURT ERRED WHEN IT DENIED LEWIS’S MOTION TO HAVE THE STATE CRIME LABORATORY ANALYZE HIS SHIRT FOR THE PRESENCE OF PEPPER SPRAY AND FUNDS FOR HAVING AN OUT OF STATE WITNESS TO TESTIFY ON HIS BEHALF
A. Pepper Spray
¶ 17. Lewis next argues that as a defendant who cannot afford the testing of evidence, the State was required to have the State Crime Laboratory to test his shirt for the presence of pepper spray. According to Lewis, the State incurred this obligation when it became known that Christi Tucker would testify that she sprayed pepper spray during her abduction. However, once again, Lewis cites no authority for the proposition that the State Crime Laboratory had an obligation to test Lewis’s shirt for the presence of pepper spray. See Ratcliff v. State, 752 So.2d 435(¶ 17) (Miss.Ct.App.1999) (noting that a failure to cite authority in support of an argument renders the issue procedurally barred). Nonetheless, and although our reasoning is of no consequence to the outcome of this issue, we will take this opportunity to address it as if it was not procedurally waived.
¶ 18. The State does not have a constitutional obligation to provide indigent defendants with the costs of expert assistance upon every demand. Johnson v. State, 476 So.2d 1195, 1202 (Miss.1985). However, this Court does recognize that expert assistance should be paid for in certain cases and will address the need for support on a case by case basis to determine whether a defendant is prejudiced by the denial of expert assistance to the extent that he or she is denied a fair trial. Id. This Court reviews the trial court’s denial of expert assistance under an abuse of discretion standard; that is, we will not reverse unless “an abuse of discretion occurred such that the defendant was denied due process whereby the trial was fundamentally unfair.” Richardson v. State, 767 So.2d 195, 197(¶ 7) (Miss.2000).
¶ 19. A defendant’s undeveloped assertions will not justify the expenditure of public funds on expert assistance. Id. The “[defendant must demonstrate a substantial need in order to justify the trial court expending public funds for an expert to assist the defense.” Id. The public’s funds will not be spent in order to aid a party in conducting a fishing expedition for unknown, speculative evidence. Holland v. State, 705 So.2d 307, 334 (Miss.1997). See also Hansen v. State, 592 So.2d 114, 125 (Miss.1991) (noting that defendant must offer concrete reasons).
¶ 20. Prior to voir dire, Lewis moved to have the shirt he was wearing at the time of his arrest tested for pepper spray; however, he offered no reasons as to why the test was necessary to his defense. He now argues that the absence of the pepper spray proves that he could not have been Tucker’s abductor. This argument, not *827 withstanding the procedural bar, is without merit.
¶21. Tucker testified that she sprayed pepper spray during her initial altercation with Lewis. However, she could not testify as to the quantity of pepper spray that she actually sprayed. Moreover, Tucker doubted that the pepper spray ever came into contact with Lewis as he had grabbed it from her hand and thrown it to the ground. As the record demonstrates, with the exception of Tucker, no other reference was made to the pepper spray by any of the State’s witnesses. Essentially, Tucker only mentioned the pepper spray when detailing the specific circumstances of the kidnaping and the presence of the pepper spray was never relied upon by the State in making its case against Lewis. Even if a test of the shirt came out negative for the presence of pepper spray, Tucker’s explanation fully accounted for its absence. As such, we do not see how the trial court could have abused its discretion by denying Lewis’s request for expert assistance on an issue that was immaterial to either the State’s or Lewis’s theories of the case. In reaching this conclusion we note that the trial court authorized the expenditure of $2000 of public funds to pay for Lewis’s DNA expert. The issue of DNA, unlike that of pepper spray, was fundamental to both the State’s case and Lewis’s defense and the trial court decided that the issue justified the expenditure of public funds.
B. Payment of Witness
¶ 22. Lewis also argues that the trial court erred by refusing to pay $1,350 to enable a witness to travel from Georgia to testify on his behalf. According to Lewis, the witness would testify that the police were lying as to the location of blood on the impounded vehicle. The trial judge first denied the expenditure, noting that the witness, as a layman, would not have been permitted to testify to the presence of blood on the back of the vehicle. However, the trial judge ultimately refused payment on the grounds that the testimony from the witness would be a reiteration of testimony already elicited from Brenda Thomas, Lewis’s fiance. We agree with the trial judge that the evidence was cumulative and pertained to a collateral issue; the location of the blood on the vehicle had no bearing on the State’s case or Lewis’s defense. Moreover, we note that the request for funds was based on Lewis’s vague assertions; he provided no affidavits and the State did not know the name of the witness until after the trial had begun. See Johnson v. State, 477 So.2d 196, 215 (Miss.1985) (noting that trial judges should not be reversed for denial of funds where defense fails to provide detailed statements in affidavits of each witness).
IV. WHETHER THE TRIAL COURT ERRED WHEN IT REFUSED TO DECLARE A MISTRIAL
¶ 23. During the direct examination of Officer Stanley Butler, the State asked a question in respect to the actions taken by Lewis once he was brought into the police station following his arrest. Officer Butler testified that “[t]he subject came in and he was immediately read his rights, and at that time he refused to give us a statement and talk with us.” Lewis objected to this answer and the parties approached the bench. Following a bench conference, the trial judge sustained Lewis’s objection and asked the jury to disregard Officer Butler’s response; each juror responded that he or she would disregard the answer, Lewis argues that the trial judge should have declared a mistrial at that point in the trial as the jury would almost certainly infer Lewis’s guilt from his refusal to speak to the police immediately following his arrest.
*828 ¶ 24. Similarly, Laura Hutchen, a witness for the State, testified that she saw a man matching Lewis’s description in Bel-haven the morning of the kidnaping. On cross-examination Hutchen admitted that she was unable to identify Lewis during a subsequent photo lineup. Hutchen also stated that the reason she could not identify Lewis in the photo lineup was due to the fact that his picture had been over eight years old. Prior to the trial, the parties had agreed that no reference would be made to the age of Lewis’s photograph in front of the jury. The trial court sustained Lewis’s objection to Hutchen’s testimony and instructed the jury to disregard the statement. Each juror responded that he or she would disregard the statement.
¶ 25. The trial judge “is in the best position for determining the prejudicial effect” of objectionable testimony. Alexander v. State, 520 So.2d 127, 131 (Miss.1988). Therefore, the decision as to whether a prejudicial comment warrants a mistrial is within the trial judge’s sound discretion. Horne v. State, 487 So.2d 213, 214 (Miss.1986). Absent “serious and irreparable damage,” the trial judge should request the jury to disregard the improper statement and deny any motion for a mistrial. Roundtree v. State, 568 So.2d 1173, 1178 (Miss.1990). “It is well settled that when the trial judge sustains an objection to testimony and he directs the jury to disregard it, prejudicial error does not result.” Estes v. State, 533 So.2d 437, 439 (Miss.1988). We presume that the jurors will follow the instructions given by the court. Payne v. State, 462 So.2d 902, 904 (Miss.1984). “To presume' otherwise would be to render the jury system inoperable.” Johnson v. State, 475 So.2d 1136, 1142 (Miss.1985).
¶ 26. In applying the law to the facts in the case at bar, this Court concludes that the trial judge did not abuse his discretion by refusing to declare a mistrial. Officer Butler’s remark was improper, but assuming there was a prejudicial effect, it was cured by the judge’s immediate instruction that the remark be disregarded. Likewise, Hutchen’s testimony was improper as per agreement by both parties prior to the trial; however, reference to the eight year old photograph was insignificant and any prejudice that arose from its disclosure was cured by the jury’s affirmation that it would be disregarded.
V. WHETHER THE TRIAL COURT ERRED WHEN IT ADMITTED DNA EVIDENCE
¶ 27. Lewis next argues that the DNA evidence should have been excluded by the trial court where the State never presented evidence to the jury that the Mississippi State Crime Laboratory (MSCL) was certified to perform the DNA analysis or in the DNA sample preparation. According to Lewis, the State has essentially shifted the burden to him in order to show that the MSCL was not accredited. We find Lewis’s argument lacking in merit.
¶ 28. The admissibility and relevancy of evidence is within the discretion of the trial court and, absent an abuse of that discretion, the trial court’s decision will not be disturbed on appeal. Reynolds v. State, 784 So.2d 929, 932(¶ 7) (Miss.2001). As long as the trial court remains within the confines of the Mississippi Rules of Evidence, its decision to admit or exclude evidence will be accorded a high degree of deference. Johnston v. State, 567 So.2d 237, 238 (Miss.1990). Additionally, “the admission or exclusion of evidence must result in prejudice or harm, if a cause is to be reversed on that account.” Jackson v. State, 594 So.2d 20, 25 (Miss.1992).
¶ 29. Ordinarily, on a challenge to the admissibility of DNA evidence, a trial *829 court will conduct a hearing pursuant to the Mississippi Supreme Court’s decision in Polk v. State, 612 So.2d 381 (Miss.1992); such a hearing was held in this case. In Polk the Mississippi Supreme Court announced the three part test for determining the admissibility of forensic DNA analysis:
1. Is there a theory, generally accepted in the scientific community, that supports the conclusion that DNA forensic testing can produce reliable results?
2. Are there current techniques that are capable of producing rehable results in DNA identification and that are generally accepted in the scientific community?
3. In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the performance or interpretation of the tests?
Polk, 612 So.2d at 390.
¶ 30. As noted, Lewis first asserts that the MSCL failed to establish itself as certified to perform the DNA analysis. However, this argument is misplaced as ReliaGene, a private company certified to perform DNA testing, performed the actual tests. In making his determination as to whether ReliaGene was qualified to perform the actual analysis, the trial judge conducted a hearing outside the presence of the jury to determine if the elements of Polk had been satisfied.
¶ 31. The court examined the State’s DNA expert and employee of ReliaGene, Gina Pineda. According to Pineda, the lab performed a polymerase chain reaction (PCR) test on the blood taken from Lewis’s shirt. Pineda testified that this particular test is the type used in most forensic laboratories and is the preferred method where the blood samples are small or otherwise degraded. She specifically noted that this test is widely accepted in the scientific community and fully supported by scientific literature. She also stated that the PCR test, when administered properly, has no error rate.
¶ 32. In addition to the general background given by Pineda on PCR testing, the trial judge questioned whether Relia-Gene’s testing procedures conformed to the accepted scientific standards. Pineda described how ReliaGene is a nationally certified company and undergoes numerous inspections each year by the National Forensic Science Technology Center. Likewise, ReliaGene has a standard operating procedure manual as well as a quality control manual that is followed in every case for every sample processed. Pineda detailed how each step was followed in respect to the bloodstains found on Lewis’s shirt.
¶ 33. Pineda was qualified to perform the tests and to testify as an expert in regard to the conclusion reached by the test. Moreover, it is clear that Pineda’s extensive and detailed description of PCR testing and her statements concerning Re-liaGene’s adherence to the standards determined by the scientific community in this case allowed the trial judge to conclude that each element of Polk had been satisfied. We find no error in the trial judge’s decision to allow the DNA evidence to be presented to the jury.
¶ 34. In addition to his argument against the testing of the DNA, Lewis asserts that the MSCL failed to prove that it was qualified to perform the sample preparation for the DNA tests. Specifically, Lewis contends that Dana Johnson, an expert in the field of forensic serology, failed to establish that the MSCL was certified to prepare samples of DNA for testing. However, as the State correctly points out, Lewis accepted Johnson as an expert and never objected to the admission *830 of the DNA on the basis that the MSCL was not certified to prepare the DNA samples. As the Mississippi Supreme Court has made clear, “[a] trial judge cannot be put in error on a matter that was not presented to him for decision.” Crenshaw v. State, 520 So.2d 131, 134-35 (Miss.1988). Therefore, this part of the assignment of error is procedurally barred.
VI. WHETHER THE TRIAL COURT ERRED WHEN IT DENIED JURY INSTRUCTIONS D-l AND D-10
¶35. Lewis argues that the trial court erred when it refused two of his proposed jury instructions. The Mississippi Supreme Court has repeatedly held that “[i]n determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found.” Coleman v. State, 697 So.2d 777, 782 (Miss.1997) (quoting Collins v. State, 691 So.2d 918, 922 (Miss.1997)).
A. Instruction D-l
¶ 36. Lewis submitted jury instruction D-l which read, “The Court instructs the Jury that you must find Rannell Lewis not guilty.” In support of this instruction, Lewis argued that the DNA evidence should have been excluded from the jury; therefore, in the absence of such evidence, he was entitled to a directed verdict. In addition to the general standard for reviewing jury instructions, this Court will review the overruling of a peremptory jury instruction the same way it does a motion for directed verdict. Bridges v. State, 790 So.2d 230, 232(¶ 5) (Miss.Ct.App.2001).
-¶37. It is well established that a motion for a directed verdict challenges the legal sufficiency of evidence supporting a guilty verdict. May v. State, 460 So.2d 778, 780 (Miss.1984). When testing the legal sufficiency of evidence, this Court must accept all credible evidence that supports the guilty verdict as true and afford the State “the benefit of all favorable inferences that may reasonably be drawn from the evidence.” Wetz v. State, 503 So.2d 803, 808 (Miss.1987). This Court will not reverse unless it is clear from the evidence that “no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty.” Pearson v. State, 428 So.2d 1361, 1364 (Miss.1983).
¶ 38. Shortly after Tucker jumped from the trunk of the vehicle, Lewis was pulled over driving the car used in the kidnaping. He was wearing a grey long sleeve shirt and dark pants. He also had patches of blood on his shirt. As previously determined, the DNA evidence was properly presented to the jury after the trial judge tested its admissibility under the standard set out in Polk. The DNA evidence allowed Pineda to conclude that there was a one in ten billion chance that the blood on Lewis’s shirt matched someone other than Christi Tucker.
¶ 39. Additionally, the State presented an abundance of evidence that rebutted Lewis’s defense that someone stole his vehicle while he was asleep in a motel, kid-naped Tucker, and returned the vehicle before he awoke. The State presented two witnesses who testified to seeing a man matching Lewis’s description in the Belhaven area just a short time before the crime. According to the first witness, a large black male dressed in dark pants and a grey sweatshirt followed her around Bel-haven that morning. She described his vehicle as a green Mazda. Likewise, the second witness testified that a large black male in a dark green Mazda followed her throughout the Belhaven area. She testi- *831 fled that the man exited his vehicle and was moving things around in his trunk. The witness stated that he had a wooden handled hammer in his hand.
¶ 40. The testimony of both witnesses corroborated the statements given by Tucker. According to Tucker, her kidnapper was a large, black male dressed in a gray sweatshirt and dark pants. He was driving a dark green Mazda. Moreover, Tucker used a hammer with a wooden handle to escape from the trunk of Lewis’s vehicle. Given the consistency of testimony, the presence of Tucker’s blood on Lewis’s shirt, and the fact that Lewis was found shortly after the kidnaping in the car used in the kidnaping, we find that a reasonable juror could have convicted Lewis on the evidence presented; therefore, the trial judge did not err in refusing to grant jury instruction D-l.
B. Instruction D-10
¶ 41. Lewis also argues that the trial court failed to properly instruct the jury, thus committing reversible error, when it refused to grant a “suspicion” instruction. Jury instruction D-10 stated that the jury could not convict on mere suspicion alone. According to the State, jury instruction C-l was synonymous with the “suspicion” instruction; therefore, there can be no error as the inclusion of D-10 would have been cumulative. Jury Instruction C-l read in part:
It is your function to determine the facts in this case and to consider and weigh the evidence for that purpose. You are to apply the law to the facts, and in this way decide the case.... You are required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified. You should not be influenced by bias, sympathy or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork or conjecture.
According to Lewis, the absence of a “suspicion” instruction leaves room for the jury to misapprehend the law. However, contrary to this assertion, we fail to see how the suspicion instruction as requested in instruction D-10 is not incorporated into instruction C-l which instructs the jury to base its verdict on the evidence alone. See Woodham v. State, 800 So.2d 1148, 1156 (¶ 21) (Miss.2001) (stating that “if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results”). When the instructions are read as a whole, we find that the instructions given to the jurors were a full and fair account of the law, leaving no room for misapprehension.
VII. WHETHER THE TRIAL COURT ERRED WHEN IT LIMITED CLOSING ARGUMENTS TO THIRTY MINUTES PER SIDE
¶ 42. Lewis next argues that the trial court erred when it rejected his request for a forty-five minute closing argument. The court, after considering Lewis’s request, determined that each side could easily make its argument within thirty minutes. When the court announced its decision, neither party objected and the State proceeded without incident. However, during argument by the defense counsel, the trial judge, noting the expiration of thirty minutes, asked that the argument be concluded. Defense counsel objected and made a proffer of what he believed he needed to argue.
¶ 43. A trial judge “has the duty of conducting an orderly trial ... [including the] duty to see that the court’s time is used economically. Likewise, the trial judge is allowed discretion in the conduct of a trial.” Walker v. State, 671 So.2d *832 581, 609 (Miss.1995). Therefore, the amount of time for closing argument, as a subset of the trial, is left to the trial court’s sound discretion. Gray v. State, 351 So.2d 1342, 1346 (Miss.1977). However, this discretion is not unfettered and the trial court should always exercise caution when making a decision to limit time. Ray v. State, 330 So.2d 580, 586 (Miss.1976). In determining whether the trial court abused its discretion, we look to see whether the limitation compromised the defense’s right to be heard. Willie v. State, 585 So.2d 660, 676 (Miss.1991), overruled on other grounds by King v. State, 784 So.2d 884, 889(¶ 19) (Miss.2001); Turner v. State, 220 So.2d 295, 298 (Miss.1969) (refusing to reverse absent a showing of prejudice). We will not reverse the trial judge’s decision where the defendant had sufficient time to give a closing argument. Willie, 585 So.2d at 676.
¶ 44. According to Lewis, the trial was complicated as it lasted four days and included twenty-five witnesses. Furthermore, the case was complicated by issues of police and judicial misconduct, invoking images of Rodney King, Hiroshima, and even Einstein’s theory of relativity. However, in respect to Lewis’s guilt, nothing could be farther from the truth; this case was straightforward and uncomplicated.
¶45. Throughout the trial, Lewis defended against the State’s charge by arguing that he was not the one who committed the crime. The record makes clear this was Lewis’s sole defense. According to the trial judge, thirty minutes was a reasonable amount of time for Lewis to attack the State’s case and present his argument to the jury.
¶ 46. When we look at the argument made by Lewis prior to the expiration of the thirty minute limit along with his proffer following summation of argument, it is clear that Lewis was not prejudiced by the time limitation. All of the issues argued in the proffer, including reference to the original 911 call, the testimony of Sgt. Slaughter, the distances and time lines between the place of arrest and the place where Tucker jumped from the vehicle, and the DNA samples were thoroughly addressed during the thirty minute argument. See Walker v. State, 671 So.2d 581, 609 (Miss.1995) (noting that repetitive argument made on proffer supports trial court’s decision to limit closing argument). Given the deference vested in the trial court in limiting closing arguments to a particular time and that such limitation did not impair defense counsel’s ability to review and argue the evidence in support of Lewis’s theory of the case, we find that the trial court did not abuse its discretion.
VIII. WHETHER THE TRIAL COURT ERRED WHEN IT DENIED LEWIS’S MOTION TO QUASH THE HABITUAL OFFENDER PORTION OF THE INDICTMENT
¶ 47. Following the guilty verdict, the jury was discharged and the circuit court proceeded to the sentencing phase of the case. The State charged Lewis as a habitual offender under section 99-19-83 of the Mississippi Code. Lewis objected and moved the court to strike the enhanced punishment portion from the indictment. “[T]he question of whether an indictment is fatally defective is an issue of law and deserves a relatively broad standard of review....” Peterson v. State, 671 So.2d 647, 652 (Miss.1996).
¶ 48. The record reflects that nothing concerning the previous crimes appeared on the face of the indictment; however, in a document marked exhibit A, which the grand jury possessed during its deliberations, two prior felonies were documented. In support of his argument, Lewis cites Ormond v. State, 599 So.2d 951, 963 (Miss.1992), for the proposition that fault in the *833 habitual offender portion of the indictment requires reversal as to the sentencing portion of the case. We find this case factually distinguishable from Ormond; therefore, we affirm the trial court’s refusal to quash the habitual offender portion of the statute.
¶49. In Ormond, the Mississippi Supreme Court addressed whether a prior conviction could be used to support an enhanced sentence in a subsequent case where the date of the prior conviction was not specified in the indictment. Id. In determining this issue, the court turned to the Mississippi Uniform Criminal Rules of Circuit Court Practice, noting that the rules require that any previous conviction must be included in the indictment, set out the offense with detailed particularity, and include the date of judgment. Id. The court reversed the enhanced portion of the sentence, holding that a prior conviction cannot be used to enhance a sentence where the date of judgment was not included. Id.
¶ 50. Here, the prior offenses were stated with great particularity, including the jurisdictions, charges, cause numbers and sentences. Likewise, both included the dates of the convictions. See Ard v. State, 403 So.2d 875, 876 (Miss.1981) (noting “the indictment must allege with particularity the state or federal jurisdiction of the previous felony conviction, the date of judgment and the nature or description of the offense constituting the previous felony”). Additionally, the fact that they were included in an exhibit attached to the formal indictment does not give us reason to quash the indictment as a whole. See Evans v. State, 742 So.2d 1205, 1209(¶ 14) (Miss.Ct.App.1999). As the record demonstrates, the grand jury had a copy of the prior convictions and attached them as an exhibit when it issued the formal indictment; therefore, Lewis’s argument is without merit.
¶ 51. THE JUDGMENT OF THE CIRCUIT COURT OF MADISON COUNTY OF CONVICTION OF KID-NAPING AND SENTENCE AS A HABITUAL OFFENDER TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MADISON COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, IRVING, MYERS AND BRANTLEY, JJ., CONCUR.