952 So.2d 314 (2007)
Hillman Seve Ballesterous CLEMONS a/k/a Hot Dog a/k/a Hi-C, Appellant
v.
STATE of Mississippi, Appellee.
No. 2005-KA-02143-COA.
Court of Appeals of Mississippi.
March 20, 2007.
*315 Edmund J. Phillips, attorney for appellant.
Office of the Attorney General by Scott Stuart, attorney for appellee.
*316 Before LEE, P.J., GRIFFIS and ROBERTS, JJ.
LEE, P.J., for the Court.

PROCEDURAL HISTORY
¶ 1. On November 15, 2005, a jury in the Neshoba County Circuit Court found Hillman Clemons guilty of the murder of his father, Lamen Earl Clemons. The trial court sentenced Clemons to serve a life sentence in the custody of the Mississippi Department of Corrections. Clemons then filed a motion for a new trial, which the trial court denied. Clemons now appeals to this Court asserting the following issues: (1) the trial court erred in refusing certain jury instructions; (2) the trial court erred in refusing to grant a jury instruction concerning accomplice testimony; (3) the trial court erred in refusing a manslaughter jury instruction; (4) the trial court erred in sustaining the State's objection to evidence of the victim's character on cross-examination; and (5) the trial court erred in sustaining the State's objection to evidence of the victim's violent behavior.

FACTS
¶ 2. During the summer of 2003, Clemons began talking about killing his father, Lamen. Clemons's parents were divorced and he lived with his mother until her death in February 2002. Clemons alleges that he was physically and emotionally abused by both of his parents. At some point after Clemons's mother's death, Lamen moved into the house with Clemons's little brother. Clemons was already living in his mother's house with his girlfriend, Neseiya Welch. Clemons resented Lamen's presence in his mother's home and the two began to argue frequently. This house, located in Philadelphia and previously owned by Clemons's mother, had been left to Clemons, Clemons's brother and Clemons's stepfather.
¶ 3. In September 2003, Clemons and Welch forged Lamen's name on an application for a life insurance policy. Welch testified that they both practiced signing Lamen's name several times before signing the application. After Lamen's death, Clemons tried to collect the proceeds from the policy but was unsuccessful.
¶ 4. In October 2003, Clemons told Welch he needed to buy a gun in order to kill Lamen. Welch stated that she forged documents in order to obtain a fake identification showing that Clemons was over twenty-one years old. Clemons and Welch then went to a pawn shop where they bought a gun and some bullets.
¶ 5. On the morning of October 30, 2003, Clemons woke up, told Welch "today's the day," picked up the gun and walked out of the bedroom. Welch testified that she then heard gunshots and, after peering into the hallway, saw gun smoke by Lamen's room. Clemons then returned to the bedroom with blood on the latex gloves he was wearing, blood on his clothes and the gun in his hand. Welch and Clemons put the gloves and bloody clothes into a plastic bag. At one point Clemons returned to Lamen's room to retrieve any evidence left behind. Clemons also took Lamen's gun, cell phone, pager and cash from his wallet.
¶ 6. Clemons and Welch drove to Welch's old house in Preston, approximately thirty minutes from Philadelphia, in order to dispose of both guns. Deciding that they needed an alibi, Clemons drove Welch to Meridian where they ate at a Captain D's and threw Lamen's phone and pager in a dumpster. They waited in Meridian until it was time for a high school football game to be played in Philadelphia. After driving past the house and noting that no one had found Lamen's body, Clemons and Welch went to the game. Clemons and *317 Welch left the game early to see if anyone had discovered Lamen's body. Once it was evident that Lamen's body had not been found, Clemons suggested that he drive Lamen's van to Meridian to make it look like Lamen had been robbed. The van broke down on the way to Meridian. Ultimately, Clemons and Welch returned home, packed their bags and left for California the next day. Clemons left a note for his brother, who was also living with Clemons, and Lamen. On the way to the bus station in Meridian, Clemons and Welch retrieved the two guns from Welch's house and disposed of them in a storm drain near Collinsville. Clemons also disposed of the bag of bloody clothes and gloves. Clemons was later arrested for Lamen's murder. In April 2005, the police found Clemons's gun in the storm drain and were able to match the gun with bullets and shell casings found at the crime scene.

DISCUSSION
I. DID THE TRIAL COURT ERR IN REFUSING CERTAIN JURY INSTRUCTIONS?
¶ 7. In his first issue on appeal, Clemons argues that the trial court erred in refusing certain jury instructions. Specifically, Clemons states that he was entitled to separate instructions to support his insanity defense. Prior to the end of trial, jury instructions concerning insanity were submitted by both the State and Clemons. However, at the conclusion of the evidence, the State asked to withdraw its insanity instructions claiming that there was no evidence to support Clemons's assertions that he was insane at the time of the murder. The trial court agreed and ordered all prior instructions concerning insanity, including those submitted by Clemons, to be withdrawn.
¶ 8. The trial court enjoys considerable discretion regarding the form and substance of jury instructions. Higgins v. State, 725 So.2d 220, 223(¶ 15) (Miss. 1998). All instructions are to be read together and if the jury is fully and fairly instructed, the refusal of any similar instruction does not constitute reversible error. Groseclose v. State, 440 So.2d 297, 302 (Miss. 1983). The trial court may also refuse an instruction that is "without foundation in the evidence." Jackson v. State, 645 So.2d 921, 924 (Miss.1994). In Mississippi, the question of whether a defendant in a criminal case was insane at the time of the offense is controlled by the M'Naghten test. Woodham v. State, 800 So.2d 1148, 1158(¶ 29) (Miss.2001). Under the M'Naghten test, it must be proved that at the time of committing the act the defendant "was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was wrong." Id. The inquiry under this test is whether the defendant "did not know right from wrong at the time of committing the act." Id. It is presumed that the defendant is sane until there is a reasonable doubt regarding his or her sanity. Taylor v. State, 795 So.2d 512, 517(¶ 23) (Miss.2001). When such doubt is raised, the State bears the burden of proving the defendant's sanity beyond a reasonable doubt. Id.
¶ 9. In the case at bar, Clemons presented no evidence that he was insane at the time he murdered Lamen. It was clear from Clemons's testimony that he knew it was wrong to kill people but that he felt justified in killing Lamen. Clemons stated, "I felt in my heart I had to kill him." Clemons also testified that he had threatened to kill Lamen if Lamen ever attempted to abuse him. Although there were vague allusions to his mother's mental health, there was no evidence that Clemons was suffering from a disease of the mind. The only evidence regarding Clemons's *318 health related to his diabetes, which he needs daily insulin shots to control. From a review of the record, it seems as if Clemons is trying to infer that any anger he experienced prior to killing Lamen could have resulted from a diabetic attack. However, there was no evidence showing that he experienced an attack the morning Clemons killed Lamen.
¶ 10. Dr. Mark Webb, a psychiatrist who was the State's expert witness, testified that Clemons's actions prior to and after the murder clearly show that Clemons was aware of the nature of the act of murder. Clemons's actions prior to the murder showed that he was planning to kill Lamen: he bought a gun, forged Lamen's name on a life insurance policy, and wore gloves. Clemons actions after the murder also showed that he was attempting to establish his innocence: he cleaned the house, disposed of the guns, took Lamen's things, established an alibi by driving to Meridian, and disposed of Lamen's van. Clemons offered no expert witness to support his insanity theory, only his family doctor, Dr. Randy Nance, who testified about Clemons's diabetes and his mother's health. Furthermore, at the time of the trial Dr. Nance had not seen Clemons in well over a year.
¶ 11. After reviewing applicable law and the trial testimony, the trial court found that there was no foundation in the evidence to support Clemons's insanity defense; thus, the insanity jury instructions were refused. We can find no abuse on the part of the trial court in doing so. This issue is without merit.
II. DID THE TRIAL COURT ERR IN REFUSING TO GRANT A JURY INSTRUCTION CONCERNING ACCOMPLICE TESTIMONY?
¶ 12. In his second issue on appeal, Clemons argues that the trial court erred in refusing to grant a jury instruction concerning accomplice testimony. In regards to the testimony of Welch, Clemons requested a jury instruction, D-4, as follows:
A person who claims to be criminally involved with others in a crime is an accomplice. The law looks with suspicion and distrust on the testimony of an accomplice, and requires the jury to weigh same with great care and caution and suspicion.
Clemons argues that Welch was an accomplice in the murder. The granting of a cautionary instruction regarding the testimony of an accomplice witness is discretionary with the trial court. Burke v. State, 576 So.2d 1239, 1242 (Miss.1991). There is a two-part test to determine whether a trial judge abused his discretion in these situations. Id. at 1242. First, it must be determined if the witness was in fact an accomplice and, second, if the testimony was without corroboration. Id. A cautionary instruction is warranted when the testimony of an accomplice is "unreasonable, self contradictory or substantially impeached." Ballenger v. State, 667 So.2d 1242, 1253 (Miss.1995). The trial court abuses its discretion when the State's evidence rests solely upon the testimony of an accomplice and there is some question as to the reasonableness and consistency of the testimony, or the defendant's guilt is not clearly proven. Green v. State, 456 So.2d 757, 758 (Miss.1984).
¶ 13. An accomplice has been defined as "a person who is implicated in the commission of a crime . . . if the evidence admits a reasonable inference that the witness may have been a co-perpetrator or the sole perpetrator the cautionary instruction should be given." Williams v. State, 729 So.2d 1181, 1188(¶ 31) (Miss. *319 1998) (citing Dedeaux v. State, 125 Miss. 326, 87 So. 664 (1921)). Although one could infer that Welch was an accomplice due to her actions prior to and after Lamen's death, Welch's testimony was not unreasonable, self contradictory or substantially impeached. Futhermore, since Clemons confessed to the murder, there was no question as to his guilt. We can find no abuse of discretion by the trial court in refusing the accomplice instruction.
III. DID THE TRIAL COURT ERR IN REFUSING A MANSLAUGHTER INSTRUCTION?
¶ 14. In his third issue, Clemons argues that the trial court erred in refusing to allow a jury instruction concerning manslaughter. Clemons claims that he killed Lamen in the heat of passion. Mississippi Code Annotated Section 97-3-19(1)(a) (Rev.2006) states that a person is guilty of murder "[w]hen done with deliberate design to effect the death of the person killed. . . ." Mississippi Code Annotated Section 97-3-35 (Rev.2006) deals with manslaughter committed in the heat of passion, reading: "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." "Heat of passion" has been defined as:
[a] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
Graham v. State, 582 So.2d 1014, 1017 (Miss.1991) (quoting Mullins v. State, 493 So.2d 971, 974 (Miss.1986)).
¶ 15. Although Clemons described himself as "fully raged" at the time of the killing, we cannot find that terminology sufficient in order to warrant a manslaughter instruction. Despite the fact that Lamen may have abused Clemons, the evidence showed that Clemons had considered killing his father. Clemons forged Lamen's name on a life insurance policy, bought a gun, threatened to kill Lamen, put on gloves, informed Welch "today's the day" and proceeded to shoot Lamen eight times. In fact, Clemons's testimony shows that he felt malice towards Lamen. Furthermore, there was no testimony of any provocation by Lamen. Clemons testified that he slept all night, woke up and, although he stated he was angry, decided to kill his father. We can find no error by the trial court in refusing to grant a manslaughter instruction.
IV. DID THE TRIAL COURT ERR IN SUSTAINING THE STATE'S OBJECTION TO EVIDENCE OF THE VICTIM'S CHARACTER ON CROSS-EXAMINATION?
V. DID THE TRIAL COURT ERR IN SUSTAINING THE STATE'S OBJECTION TO EVIDENCE OF THE VICTIM'S VIOLENT BEHAVIOR?
¶ 16. In his remaining two issues, Clemons argues that he should have been allowed to introduce certain evidence pertaining to Lamen's character. Specifically, Clemons wanted the jury to hear about Lamen's alcohol consumption and his violent behavior. The "relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal *320 may be had only where that discretion has been abused." Hentz v. State, 542 So.2d 914, 917 (Miss.1989). In regards to Lamen's drinking, Clemons asked his brother on cross-examination whether he saw Lamen drink alcohol. The State objected on the grounds that this testimony was not relevant. The trial court agreed finding that information about Lamen was irrelevant. The trial court found that there had already been testimony concerning the abusive nature of the relationship between Lamen and Clemons. Furthermore, Clemons did not make a proffer to show how his father's drinking was relevant to the murder. We do note that there was other testimony, namely by Clemons himself, where Lamen's penchant for alcohol was mentioned.
¶ 17. In regards to Lamen's violent behavior, Clemons asked his mother's sister if she had an opinion about whether he was a violent person. Clemons was attempting to introduce testimony that Lamen had attempted to rape the woman at some point. The trial court sustained the objection pursuant to M.R.E. 404(a), which limits the admissibility of character evidence. The trial court found that Lamen's reputation for violence was not relevant since Clemons was not arguing that Lamen was the initial aggressor, which would be allowed under M.R.E. 404(a)(2). The trial court did note that evidence of Lamen's abuse towards Clemons was already before the jury. We cannot find abuse of discretion by the trial judge in sustaining these objections.
¶ 18. THE JUDGMENT OF THE NESHOBA COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO NESHOBA COUNTY.
KING, C.J., MYERS, P.J., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.