LEE, P.J.,
for the Court:
PROCEDURAL HISTORY
¶ 1. On September 17, 2004, a jury in the Pike County Circuit Court found Karey Whittington guilty of murder. Whitting-ton was sentenced to serve a term of life in the custody of the Mississippi Department of Corrections and ordered to pay a $10,000 fine. Whittington filed post-trial motions, which were denied. After receiving permission to file an out-of-time appeal, Whittington now appeals, asserting the following issues:' (1) he was prejudiced by hearsay statements; (2) he should have been allowed to use hearsay evidence to impeach the State’s hearsay evidence; (3) prejudice resulted from certain character evidence; (4) a manslaughter instruction was required; (5) a self-defense instruction was required; and (6) the verdict is not supported by the overwhelming weight of the evidence.
FACTS
¶ 2. During the evening of March 5, 1999, Jerry Frith was shot once in the chest and died shortly thereafter. The shooting occurred on a residential street in McComb, Mississippi, in an area referred to as Baertown. A witness, Leroy Carr, heard the shot and saw a red Chevrolet Camaro speeding away from where Frith’s body was found. Carr stated that two white men were in the Camaro.
¶ 3. The investigating authorities had no leads in Frith’s death until May 2003. In May 2003, Assistant Chief Perry Ashley of the McComb Police Department was notified that Robert LeBlanc had come forward with information regarding Frith’s murder. At the time LeBlanc was a trusty at the Pike County Jail. LeBlanc told Chief Ashley that Tony Temple stated that he was involved in Frith’s death. Temple also told LeBlanc that Whittington was involved.
¶ 4. Chief Ashley interviewed Temple in June 2003. Temple admitted that he owned a red Camaro and that he and Whittington were involved in Frith’s death. Temple stated that he and Whit-tington were looking for marijuana, so Temple pulled his car over next to two men. Discovering that these men did not have marijuana, Whittington told Temple to leave. As Temple was driving away, Whittington climbed halfway out the passenger door, pointed a shotgun toward the men, and shot at them. Temple told Chief Ashley that Whittington shot Frith using the .410-gauge shotgun, which he fired from inside Temple’s car. Temple stated that the shotgun belonged to his grandfather. Temple also told Chief Ashley that Dewayne Cash was present after the murder when Whittington bragged about shooting Frith. Temple and Whittington disposed of the shotgun. On cross-examination, Temple admitted that at some point that night, Whittington told Temple that Frith had a gun. Temple testified that he never saw a gun. According to Temple, Whittington at first said he fired the shotgun to scare the men, but later that night he said he fired at the men on *110 purpose. Whittington purportedly told Temple that he shot at the men because he was tired of being “ripped off’ by drug dealers.
¶ 5. Cash testified that he was living with Whittington during the time of Frith’s murder. According to Cash, Whit-tington told him that he leaned out of the passenger-side window of the car and shot a man, while Temple drove the car away.
¶ 6. Drew Wallace was incarcerated in the Pike County Jail at the same time as Whittington. Whittington was in jail awaiting his trial for Frith’s murder. Wallace testified that Whittington said, concerning Frith’s murder, “I did it, they know I did it, but they’ll never find the weapon.”
¶ 7. Candy Berry, Whittington’s ex-wife, testified that Whittington told her Frith pulled a gun on him; and as he left the scene, he shot the shotgun in the air, not at Frith. Whittington told Berry that he had acted in self-defense.
¶ 8. Mario Molinari was also incarcerated in the Pike County Jail at the same time as Whittington. Molinari testified that Whittington told him about the circumstances surrounding Frith’s death and repeatedly bragged about the shooting to other inmates. Molinari testified that Whittington told him the authorities would never find the gun.
¶ 9. Whittington presented several witnesses from the Pike County Jail, namely Raymond Dangerfield; Michael Kennedy; and Karey Whittington, Sr., Whittington’s father. All three men stated that they never heard Whittington admit to killing anyone.
¶ 10. Amanda Brewer also testified for Whittington, stating that Berry wanted to make sure Whittington stayed in jail.
¶ 11. Dr. Steven Hayne, a forensic pathologist, testified that Frith had a gunshot wound located on his lower right chest, and that he died from massive internal bleeding. Dr. Hayne testified that the bullet, upon entering Frith, traveled downward at approximately thirty degrees, consistent with the shooter being more elevated than the victim.
¶ 12. Steve Byrd, the crime lab technician, testified that the projectile recovered from Frith’s body was consistent with a .410-gauge shotgun. Byrd also identified the piece of fiber material found in Frith’s body as being consistent with filler wadding, a substance that takes up space in a .410-gauge-shotgun slug casing.
DISCUSSION
I. HEARSAY STATEMENTS
¶ 13. In his first issue on appeal, Whit-tington argues that several hearsay statements prejudiced his defense. Under Mississippi Rule of Evidence 801(c), hearsay is defined as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” A trial court’s decision to admit or exclude testimony is reviewed for abuse of discretion. McGriggs v. State, 987 So.2d 455, 457 (¶ 3) (Miss.Ct.App.2008). “Even if this Court finds an erroneous admission or exclusion of evidence, we will not reverse unless the error adversely affects a substantial right of a party.” Id.
¶ 14. First, during Chief Ashley’s testimony, the State asked him whether Temple had offered any information regarding Frith’s murder. Whittington’s trial counsel objected on the ground of hearsay. The State countered that this information was not being submitted to prove the truth of what Temple had told Chief Ashley, but to show the steps Chief Ashley took during the investigation. The *111 State told the trial court that other witnesses, including Temple, would testify as to the truth of that statement. The trial court overruled the objection, but the Court instructed the jury that this particular statement was submitted to explain Chief Ashley’s actions in following up with the investigation. The trial court reiterated that the jury was not to take Temple’s statement to Chief Ashley as true. We find that these statements were not hearsay as they were submitted to show the actions Chief Ashley took during the investigation. See Myhand v. State, 981 So.2d 988, 991 (¶ 8) (Miss.Ct.App.2007); Ratliff v. State, 906 So.2d 133, 139 (¶ 21) (Miss.Ct.App.2004).
¶ 15. Chief Ashley also testified that he spoke with Cash the same day he interviewed Temple. The State asked Chief Ashley whether Cash’s information was consistent with Temple’s information. Chief Ashley started to answer that: “It was consistent with what Temple had already — ,” but Whittington’s trial counsel objected. Chief Ashley was not allowed to finish his statement. Although Chief Ashley did not finish his statement, we would still find this statement was submitted to show the actions Chief Ashley took during the investigation; thus, it was not hearsay.
¶ 16. Second, Detective Davis Haygood, with the Pike County Sheriffs Department, testified that LeBlanc first approached him with information about Frith’s murder. Detective Haygood reiterated that LeBlanc mentioned hearing about the murder from Temple. Whitting-ton’s trial counsel objected. The trial judge overruled the objection, finding that the information was used to show Detective Haygood’s decision to notify Chief Ashley of a potential break in the case. For the reasons stated above, we agree with the trial judge’s decision to admit this statement.
¶ 17. Last, Whittington contends that LeBlanc’s testimony, regarding how he remembered who Temple had told him was with Temple on the night of Frith’s death, was hearsay. During his first interview with Chief Ashley, LeBlanc told him the name of an individual who had been involved with Temple. The name of this other person was not Whittington. Le-Blanc testified that once he was back in his cell, he heard other inmates mention Whit-tington’s name, but not in connection with any crime. LeBlanc testified that when he heard Whittington’s name, he knew immediately that this was the name he had heard Temple say, not the name of the man LeBlanc originally named to Chief Ashley. After Whittington’s trial counsel objected to the testimony, the trial judge sustained the objection to the extent the testimony was offered to prove the truth of what was stated. However, the trial judge allowed the testimony to the extent it showed LeBlanc’s thought process in remembering Whittington’s name. We find that the trial judge did not abuse his discretion in doing so. This issue is without merit.
II. WITNESSES FOR THE DEFENSE
¶ 18. In his second issue on appeal, Whittington argues that the trial judge improperly excluded testimony from several of his witnesses, namely Dangerfield, Kennedy, and Karey, Sr. All three witnesses were in jail with Whittington at some point prior to his trial. The trial judge, citing hearsay, refused to let the witnesses testify in detail as to any conversation they may have had with Whittington concerning the murder. However, all three witnesses were allowed to testify using “yes” or “no” answers that they had never heard Whittington admit killing Frith.
*112 ¶ 19. As previously stated, hearsay “is a statement ... offered to prove the truth of the matter asserted.” M.R.E. 801(c). A statement made by Whittington to any of these witnesses would be hearsay. We can find no applicable hearsay exception which would allow the three witnesses to give detailed accounts of any conversation with Whittington concerning the murder. The trial judge was correct in limiting the answers of these witnesses.
¶ 20. Whittington also contends that the trial judge erred in excluding testimony about a purported conversation between Berry and Brewer. During cross-examination, Berry testified that she had never spoken with Brewer about wanting to keep Whittington in jail. Whitting-ton later called Brewer to the stand to testify that the two women had spoken. Brewer testified that Berry said she hoped Whittington would have to stay in jail. Whittington wanted Brewer to testify in further detail about a conversation the two purportedly had in the past, but the trial judge would not allow it, citing hearsay concerns. The trial judge found that Whittington “laid the predicate for impeachment and [had] asked the question that would impeach the witness, that there was a conversation.” The trial judge did not abuse his discretion in limiting the extent of Brewer’s testimony.
¶ 21. This issue is without merit.
III. CHARACTER EVIDENCE
¶ 22. In his third issue on appeal, Whittington argues that it was prejudice for the jury to hear that prior to his arrest for murder, he was out on bond after being charged with child abuse. On cross-examination of Berry, Whittington attempted to show that Berry was angry with him over their custody agreement and that she was trying to find a crime with which to charge him. On redirect, the State asked Berry why she initially came to the District Attorney’s Office. Berry replied as follows: “I come [sic] about child abuse and see if I could have his bond revoked to keep — .” The trial judge interrupted Berry and excused the jury. After a discussion, the trial judge brought the jury back in and informed the jurors that they were to disregard the previous question and answer. The trial judge asked each juror to raise his/her hand in an affirmative response. The State then asked if the reason Berry came to the District Attorney’s Office was in regard to her children. Berry answered in the affirmative. There were no further questions. We cannot find that the trial judge abused his discretion by asking the jury to disregard this particular question and answer. This issue is without merit.
IV. MANSLAUGHTER INSTRUCTION
¶ 23. In his fourth issue on appeal, Whittington argues that the trial judge should have given a manslaughter instruction for the jury to consider. The trial court enjoys considerable discretion regarding the form and substance of jury instructions. Clemons v. State, 952 So.2d 314, 317 (¶ 8) (Miss.Ct.App.2007). The defendant is entitled to have instructions given that present his theory of the case unless an instruction “incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.” Livingston v. State, 943 So.2d 66, 71 (¶ 14) (Miss.Ct.App.2006).
¶24. Whittington argues that the evidence at best showed he acted impulsively or in the heat of passion. Manslaughter is defined as “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense....” Miss.Code Ann. § 97-3-35 *113 (Rev.2006). “Heat of passion” has been defined as:
A state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
Graham v. State, 582 So.2d 1014, 1017 (Miss.1991) (quoting Mullins v. State, 493 So.2d 971, 974 (Miss.1986)).
¶ 25. A defendant charged with murder “is not entitled to a manslaughter instruction where the record contains no evidence from which the jury could determine that the killing resulted from heat-of-passion and not the result of malice.” Dobbins v. State, 766 So.2d 29, 33 (¶ 11) (Miss.Ct.App.2000). We find the record lacks evidence such that a reasonable juror could find Whittington guilty of manslaughter. Whittington failed to produce any evidence to show that he was in a state of violent or uncontrolled rage or that he had been provoked. Although Whittington stated at one point to Temple that he had fired the shotgun into the air to scare the men, he later admitted to Temple and Cash that he had fired at Frith on purpose because he was tired of getting “ripped off’ by drug dealers. The trial judge found that there was no evidence to warrant a manslaughter instruction. We agree. This issue is without merit.
V. SELF-DEFENSE INSTRUCTION
¶ 26. In his fifth issue on appeal, Whittington argues that the trial judge erred in refusing his self-defense instruction. Mississippi Code Annotated section 97—3—15(l)(f) (Rev.2006) states that the killing of a human being is justified “[w]hen committed in the lawful defense of one’s own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished.”
¶ 27. The trial judge found that there was no evidence to warrant a self-defense instruction. Other than Berry’s testimony that Whittington told her Frith had a gun, there was no evidence that Frith was holding a gun. There was no evidence that Frith threatened to use a gun against Whittington. We find that there was no testimony introduced that Whittington thought he was in imminent danger. This issue is without merit.
VI. OVERWHELMING WEIGHT OF THE EVIDENCE
¶ 28. In his final issue on appeal, Whittington argues that the verdict is against the overwhelming weight of the evidence. ‘When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005). When reviewing the weight of the evidence, this Court sits as a thirteenth juror. Id.
¶ 29. Whittington contends that any evidence supporting the guilty verdict is based upon unreliable testimony. Although most of the witnesses for the prosecution and for the defense were criminals, it was for the jury to assess their credibility. Temple testified that he saw Whitting-ton climb out the passenger-side window and fire the shotgun toward the men. Dr. Hayne testified that the trajectory of the *114 bullet was consistent with the shooter being more elevated than the victim.
¶ 30. Cash testified that he saw Whit-tington and Temple after the murder. Whittington told Cash that he shot Frith on purpose because he was tired of getting ripped off by drug dealers. Several witnesses, who were in jail with Whittington, heard him admit to Frith’s murder. We cannot find that allowing the verdict to stand would sanction an unconscionable injustice. This issue is without merit.
¶ 31. THE JUDGMENT OF THE PIKE COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND TO PAY A $10,000 FINE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PIKE COUNTY.
KING, C.J., MYERS, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR.