MYERS, P.J.,
 

 for the Court:
 

 ¶ 1. Ada M. Tucker, Clint Moffitt, and Lillie Norton were indicted by a Benton County grand jury for one count of conspiracy to commit voter fraud and one count of voter fraud. Norton pleaded guilty to voter fraud. Tucker and Moffitt were subsequently convicted by a jury sitting before the Benton County Circuit Court of conspiracy to commit voter fraud, and both were found not guilty of the crime of voter fraud. The circuit court sentenced Tucker to five years in the custody of the Mississippi Department of Corrections, with the first year to be serve in a MDOC facility and the second year under house arrest, with three years of post-release supervision. Moffitt was sentenced to five years in the custody of the MDOC, with the first two years to be served in a MDOC facility and the third year under house arrest, with two years of post-release supervision. Both were ordered to pay a $5,000 fine. On appeal, Tucker and Moffitt raise the following six issues:
 

 I. Whether the trial court erred in allowing unfettered redirect and/or improper hearsay testimony.
 

 
 *400
 
 II. Whether the trial court erred when it failed to grant the defendants’ motion for a mistrial based on prosecutorial misconduct.
 

 III. Whether an improper comment by the trial court prejudiced the defendants’ right to receive a fair trial.
 

 IV. Whether the trial court erred in refusing to grant defense jury instructions on conspiracy and accomplice testimony.
 

 V. Whether the sufficiency and weight of the evidence are contrary to the verdict.
 

 VI. Whether the cumulative effect of all errors deprived Tucker and Moffitt of a fair trial.
 

 FACTS
 

 ¶ 2. In June 2007, the Mississippi Attorney General’s Office (AG) began conducting an undercover investigation into allegations of voter fraud pertaining to absentee ballots in the upcoming Democratic primary election in Benton County to be held on August 7, 2007. Catina Taylor, a registered voter and resident of Benton County, assisted in the AG’s investigation. On July 13, 2007, agents and Catina met at a predetermined location, where the agents outfitted Catina with a hidden camera and a body wire. Catina then drove to Norton’s place of residence. There, Catina told Norton she needed money for a bill that she owed, and she asked Norton if she could get some money for both her and husband’s votes.
 

 ¶ 3. Norton placed a phone call to Tucker. Tucker arrived at Norton’s place shortly thereafter. Tucker and Catina talked, and Tucker instructed Catina to go to the circuit clerk’s office and vote by absentee ballot. According to the videotape, Tucker said to Catina: “Tell [Martha] Mitchell that ... you need her help ... to show you people on the [ballot].” Catina then asked Tucker if she “could get her money today?” Tucker indicated yes.
 

 ¶ 4. Tucker then made a phone call to Moffitt, a candidate running for Sheriff of Benton County against incumbent Sheriff Arnie McMullen in the August 7 primary. Moffitt arrived at Norton’s residence a short while later. The videotape entered into evidence at trial reveals some of what transpired at that point: After exchanging greetings, Catina said to Moffitt, “I can get a lot of people for you.” Moffitt replied, “I know you can ... I ain’t questioning that.” Catina then said, “I can take my husband in the morning, but I want to do me today.” Moffitt responded, “O.k.” Tucker told Moffitt that Catina “needs the money for her light bill and stuff.” Moffitt told Catina, “just keep communicating with [Tucker] or [Norton].” He then said, “I’ll get you some gas money, because I don’t expect you to go out and help me for nothing.” Tucker again stated that Catina “needed the money for her vote and her husband’s vote so that she could pay her light bill and water bill and that she needed it today.” Moffitt replied, “I’m coming back up here.” Tucker then suggested that Moffitt “could drop it off with [Norton].” Catina said that she would go to the courthouse and vote, and then she would stop by Norton’s residence at 5:00 p.m. Norton interrupted and said she would be at work at the “Citgo” by that time. Moffitt told Catina to “see [Norton] at the Citgo.” Moffitt then stated to Cati-na: “When you’re dealing with these folks ... we ain’t buying no votes, all we’re doing is giving them gas money to go talk for us. That way they can’t hold nothing on you.” Tucker then stated: “We’ll be in the clear; you’ll be in the clear; they’ll be in the clear.” Moffitt again reiterated he was not buying votes. He said, “I strictly give folks gas money, ever how they want
 
 *401
 
 to use it, whether it’s on water bills, gas, satellite.... ”
 

 ¶ 5. Catina left Norton’s residence and drove to the courthouse. There, Catina spoke with Mitchell, the Circuit Clerk of Benton County. Catina told Mitchell that she wanted to vote by absentee ballot, and she told Mitchell that she needed help reading the ballot. Mitchell directed Cati-na over to one of Mitchell’s deputy clerks. After obtaining some information from Ca-tina, the deputy clerk sent Catina into a room where Catina sat by herself and filled out her absentee ballot. After filling out her ballot, Catina put the ballot into an envelope, which Catina sealed. Catina then left the room, and she handed the envelope to the deputy clerk. The deputy clerk noticed that Catina had failed to sign her name properly across the flap of the envelope. The deputy clerk instructed Ca-tina to go back into the room where she had voted, remove the marked ballot, place it an another envelope, and sign it correctly. At trial, Catina testified that she did not vote for Moffitt.
 

 ¶ 6. According to the videotape, Tucker was at the circuit clerk’s office during the time Catina was there. At one point on the videotape, Catina and Tucker walk past each other without speaking.
 

 ¶ 7. Later that afternoon, Catina drove to the Citgo where Norton was working. While there, Moffitt called Norton’s cell phone. Catina said she spoke to Moffitt, and he informed her that she did not vote the way “he wanted.” According to Cati-na, she told Moffitt that she still expected to be paid for having “voted.” Catina said that Moffitt then told her to hand the phone back to Norton. Catina said that Norton then paid her forty dollars. According to the videotape, Norton told Cati-na that the money was a “loan,” and she said to Catina, “you can pay me back ... when you can.”
 

 ¶ 8. Catina left the Citgo, got into her vehicle, and displayed the money she had received from Norton to the camera. Ca-tina later met with the investigators, where she turned over the money, along with the audio and video equipment.
 

 ¶ 9. At trial, Norton, who was called to testify by the State, told the jury that Moffitt had recruited her to help him in his campaign, and he asked her to get in touch with Tucker. Norton testified that she was responsible for driving people to the circuit clerk’s office so that they could vote by absentee ballot. Norton stated that she told the prospective voters to vote for Moffitt, and she instructed them to seek help from Mitchell with their ballots. Norton indicated that she was instructed by Moffitt to give the voters $20 in “gas money.” Norton told the jury that Tucker would reimburse her afterwards.
 

 ¶ 10. Norton then gave her version of what had transpired on July 13. According to Norton, Catina came to her house and asked her to call Tucker because she needed money for bills. Norton complied. When Tucker arrived, Tucker instructed Catina on how to vote by absentee ballot and to ask for Mitchell’s assistance when voting. Norton said Tucker then called Moffitt. When Moffitt arrived, he told Catina that he would give her “gas money.” Norton said that she received phone calls later that afternoon from both Tucker and Moffitt, informing her that Catina had not voted for Moffitt. According to Norton, Moffitt told her not to pay Catina because she did not vote for him. Norton said she told Moffitt that he should still pay Catina her “gas money,” because it was the right thing to do. And she told Moffitt that if he did not pay Catina, she would. Norton did not say what, if anything, Moffitt said to her after she told him that. Norton said that she then gave Cati-na $40. According to Norton, Sammie Or-
 
 *402
 
 man, Moffitt’s father-in-law, later brought her some money that she claimed was owed to her.
 

 ¶ 11. Tucker and Moffitt were found guilty of conspiracy to commit voter fraud. And this appeal followed.
 

 DISCUSSION
 

 I. Improper Redirect and Hearsay Statements
 

 ¶ 12. The defendants argue that despite their timely objection, Norton was allowed to testify about hearsay statements allegedly made by Orman, and she was allowed to talk about subject matter not brought out during cross-examination. Specifically, the defendants contend that during Norton’s redirect examination, she stated that the reason she had “conspired” with the defendants was because she was afraid of losing her job. According to the defendants, Norton said Orman had threatened her with her job if she did not help in the “conspiracy.” They claim that the trial court overruled their objection and erroneously allowed the State to proceed with its questions, which resulted in testimony that adversely affected the defendants’ rights to a fair trial.
 

 ¶ 13. Evidentiary rulings are within the trial court’s broad discretion and will not be held in error unless the record clearly shows that the trial court abused its discretion.
 
 Hall v. State,
 
 785 So.2d 302, 304 (¶ 6) (Miss.Ct.App.2001). Even when found to be erroneous, we will not reverse the trial court’s ruling unless it resulted in unfair prejudice.
 
 Id.
 
 Accordingly, trial courts are given broad discretion in allowing or disallowing redirect examination of witnesses, and when defense attorneys inquire into a subject matter during cross-examination of the State’s witnesses, prosecutors unquestionably are entitled to elaborate on the subject matter during redirect.
 
 Manning v. State,
 
 835 So.2d 94, 99-100 (¶ 15) (Miss.Ct.App.2002).
 

 ¶ 14. The record reveals that during Norton’s cross-examination, Norton was asked by defense counsel whether she considered Moffitt to be a friend of hers. Norton replied, “No.” Norton then stated that Moffitt’s “step-dad,”
 
 [1]
 
 had her working for Moffitt. When defense counsel questioned Norton further, Norton stated that Moffitt’s “step-daddy had her off work” to help Moffitt get elected sheriff. The record also discloses the following colloquy that occurred later in Norton’s cross-examination between Norton and defense counsel:
 

 Q. Now, you told the jury a few minutes ago that [Moffitt] told you that you had to help him?
 

 A. His step-daddy is the one that told me.
 

 Q. But you told the jury that [Moffitt] told you that, didn’t you?
 

 A. Yeah.
 

 Q. Okay. So which one is the truth— that statement or what you told the jury that [Moffitt] basically [had] threatened you to make you work?
 

 A. He didn’t threaten me.
 

 Q. But you did tell them that he made you do it, didn’t you?
 

 A. His step-daddy told me I had to help him.
 

 ¶ 15. During the State’s redirect, the following exchange occurred:
 

 Q. Now, [counsel] asked you about whether [Moffitt] [had] threatened you. Who did you work for?
 

 A. I worked for his daddy-in-law.
 

 Q. And was that the only job you had?
 

 
 *403
 
 A. That was the only one I had right then until they dumped me.
 

 [[Image here]]
 

 Q. Did you testify your boss, his stepfather, told you to help him with [Mof-fitt’s] campaign?
 

 A. Sure did.
 

 Q. Were you afraid of losing your job if you didn’t do it?
 

 A. I was. I was because he said I can put somebody else in your place, and that’s what he did.
 

 ¶ 16. Defense counsel objected at this point on the ground that Norton’s statement was based on hearsay. The State responded, claiming that defense counsel had opened the door on cross-examination. The trial court overruled defense counsel’s objection.
 

 ¶ 17. The defendants now claim on appeal that they were never made aware of such testimony, and they maintain that the trial court erred by not sustaining their objection. Based on our review of the record, defense counsel clearly elicited this subject matter on cross-examination, and the State had the right to develop it on redirect. This issue lacks merit.
 

 II. Prosecutorial Misconduct
 

 ¶ 18. The defendants argue that they were denied their fundamental rights to a fair trial due to the introduction of unsubstantiated and prejudicial evidence by the State during a speaking objection. The defendants contend that when Norton could not explain during cross-examination why her phone records did not show Tucker’s phone number, the prosecutor objected to defense counsel’s line of questioning, stating: “I believe the defense lawyer is attempting to say that just because [Tucker] didn’t call from her cell phone[,] she didn’t call. I believe there is more than one phone in Benton County. He is arguing with the witness.”
 

 ¶ 19. The defendants maintain that they contemporaneously objected to the prosecutor’s speaking objection and asked for a mistrial. But the trial court overruled the objection and denied their request for a mistrial stating that it was not contemporaneously made since defense counsel waited until the end of the State’s speaking objection before defense counsel objected.
 

 ¶20. According to the record, defense counsel did not expressly object to the prosecutor’s statement; rather, counsel asked to be heard at the bench, where he immediately then moved for a mistrial on the basis of the prosecutor’s “continuous speaking objections.” The trial court denied the motion and admonished defense counsel for not making a contemporaneous objection.
 

 ¶ 21. By failing to make a specific objection, defense counsel prevented the trial court from making a proper ruling and/or taking corrective action. Instead, defense counsel compelled an express ruling on an ore tenus motion for mistrial, which was denied. We decline to hold the trial court in error for a ruling the court did not have an opportunity to make.
 

 ¶ 22. Nor do we find that the prosecutor’s statement necessitated a mistrial. Though improper, the statement did not create an unjust prejudice against the defendants so as to result in a decision influenced by prejudice.
 
 Jackson v. State,
 
 924 So.2d 531, 542 (¶36) (Miss.Ct.App.2005). Reasonable minds can reach different conclusions from the fact that Tucker’s phone number was not listed on Norton’s phone records, yet still agree on the ultimate fact question of Tucker’s guilt from the evidence as a whole. We find no merit to this issue.
 

 
 *404
 
 III. Trial Judge’s Comment
 

 ¶ 23. The defendants argue that the trial court made a biased statement during the cross-examination of Investigator Roger Cribb which called into question the neutrality, fairness, and impartiality a trial court must hold in the presence of the jury. The defendants contend that defense counsel was thoroughly cross-examining Cribb about Norton’s involvement, if any, in the conspiracy to commit voter fraud with Tucker and Moffitt. At one point, defense counsel was specifically questioning Cribb about what Norton had said on the undercover videotape — that she was only loaning money to Catina. According to the defendants, Cribb’s impression of the transaction on the tape was that Norton was paying Catina for her vote and then went so far as to give his legal theory as to what is or is not against the law with regard to voting. As a result of Cribb’s “unresponsive, long narrations of what he perceived things to be,” defense counsel requested that the trial court instruct the witness to answer the question. The trial judge replied: “If you press too hard, you get more information than you’re looking for sometimes.” This resulted in laughter from the jury.
 

 ¶ 24. A lengthy bench conference ensued outside the presence of the jury. The defendants moved for a mistrial on the basis that the jury could have perceived the judge’s comments as placing weight on the evidence. The judge responded that he thought it was a “benign” comment. He said he had meant it in the context that all counsel, the State included, had been asking too many compound questions, and getting responses in kind from the witnesses. The judge said the statement was meant to “expedite things along.” The judge declined to grant a mistrial, and he said he would give a curative instruction. The judge asked defense counsel if they had any suggestions. Defense counsel stood by their motions and left it up to the judge to decide what type of instruction to give to the jury. When the jury was brought back into the courtroom, the judge admonished the jury not to take what he said as commenting on the evidence. He then told the jury that it was not the court’s intention to demean the proceedings.
 

 ¶ 25. As the defendants point out on appeal that, “[t]he trial judge always must be circumspect and unbiased, at all times displaying neutrality and fairness in the trial, and consideration for the constitutional rights of the accused.”
 
 Simmons v. State,
 
 746 So.2d 302, 307 (¶22) (Miss.1999). We absolutely agree. And we will not hesitate to reverse a case where “the trial judge displays partiality, becomes an advocate, or, in any significant way, conveys to the jury the impression that he has sided with the prosecution[.]”
 
 Walden v. State,
 
 29 So.3d 17, 22 (¶ 16) (Miss.Ct.App.2008) (quoting
 
 Jones v. State,
 
 669 So.2d 1383,1387 (Miss.1995)).
 

 ¶ 26. The following portion of Cribb’s cross-examination reflects what transpired prior to and immediately following the court’s statement:
 

 Q. And [Norton], you claim, was part of the conspiracy?
 

 A. Yes, sir.
 

 Q. And as that conspirator, you were trying to tie them altogether, and my point being is she’s part of the conspiracy, yet she’s saying, I don’t know anything about the money. I’m just hauling folks. That’s what she said, wasn’t it? I don’t know anything about paying people?
 

 A. She may have said that.
 

 Q. Okay.
 

 A. She certainly paid on July the 13th.
 

 Q. That’s your impression.
 

 
 *405
 
 A. No, sir. That’s on the tape, sir.
 

 Q. Where she gave a loan?
 

 A. Where she gave a loan. If she had gave [sic] a chicken wing for that vote, it would have been the same thing. You can’t give nothing.
 

 Q. I understand that.
 

 A. You can’t even offer anything. Phrase it however you want to, she got money for what [Tucker] told her she was going to get it for, her vote and her husband’s vote.
 

 BY MR. MICHAEL: Your Honor, I’m just asking a question.
 

 A. I’m trying to answer him. I’m trying to answer him.
 

 BY THE COURT: If you press too hard, you get more information than you’re looking for sometimes.
 

 (LAUGHTER BY JURY PANEL)
 

 BY THE COURT: Just try to have a summary short question and expect a short answer.
 

 ¶ 27. We find the trial judge’s comment to be harmless. From the context of the statement, it is clear that the trial court was not exhibiting favoritism toward the State or bias toward the defendants. The record, indeed, reveals that prior to the judge’s comment, a number of lengthy questions had been propounded to this witness and those witnesses preceding him, often resulting in lengthy responses. Pri- or to the judge’s remark, the judge had cautioned both parties to shorten their questions and to speed things up for the sake of the jury.
 

 ¶ 28. After the remark, the trial judge sought input from both defense counsel on how to mitigate the harm they claim had resulted by his remark. Rather than contribute any suggestions, defense counsel stood by their request for a mistrial, which we find the trial court correctly denied. The trial court handled the matter in the manner the court deemed appropriate and provided a curative instruction. Based on well-settled principle, we presume the jury heeded the court’s directive. We find this issue is without merit.
 

 IV. Defense Jury Instructions
 

 A. Conspiracy
 

 ¶29. The defendants contend the trial court erred when it refused to grant defense jury instructions, D1-8A1 and D-8A1 (same instructions for each defendant), concerning the elements the State must prove in order to convict the defendants of conspiracy to commit voter fraud. Specifically, they contend they were prejudiced by the alternative instructions given, D1-8A2 and D-8A2, concerning the elements, due to the term “individuals” being inserted as opposed to “Catina Taylor.” The defendants assert they were charged in their respective indictments with conspiring to influence the absentee vote of Catina Taylor, not “individuals.”
 

 ¶ 80. Based on our review of both indictments, both defendants were charged with conspiring to influence the absentee vote of “individuals.” No mention was made of Catina Taylor. Further, the term “individuals” clearly was meant to indicate Catina and her husband. Accordingly, we find no error with the trial court’s refusal to give instructions D1-8A1 and D-8A1.
 

 B. Accomplice Testimony
 

 ¶ 31. The defendants argue that the trial court erred by refusing to grant an accomplice-testimony instruction. The proposed instruction, D-4A-1, was in regard to the testimony of Norton, and it states:
 

 In this case, [Norton] is an alleged accomplice. An “Accomplice is someone who knowingly, voluntarily, and with
 
 *406
 
 common intent with the principle offender unites in the alleged commission of a crime. The Court instructs the jury that the law looks with suspicion and distrust on the testimony of an accomplice, and requires the jury to weigh that testimony with great care and suspicion. You should weigh the testimony from an accomplice, and determine what weight, if any, you should give that testimony. You should weigh it with great care and opinion, and look upon it with distrust and suspicion.
 

 ¶ 32. When determining whether to grant a cautionary instruction based on the testimony of an accomplice, “the trial judge considers whether the witness was in fact an accomplice and whether the witness’s testimony was corroborated.”
 
 Williams v. State,
 
 32 So.3d 486, 490 (¶ 12) (Miss.2010) (citing
 
 Brown v. State,
 
 890 So.2d 901, 910 (Miss.2004)). “Although granting a cautionary instruction ... is within the trial court’s discretion, such instruction is required when the accomplice’s testimony is the sole basis for the conviction, and the defendant’s guilt is not clearly proven.”
 
 Id.
 
 The court has further held that where the State’s case is based upon the testimony of an accomplice, corroborated only by a confidential informant, the trial court must accede the defendant’s request and grant a cautionary instruction.
 
 See id.
 
 at 492 (¶ 21) (reiterating the court’s sentiment that “both accomplice and informant testimony are, ‘by their very nature, looked upon with suspicion and distrust’ ”).
 

 ¶ 33. At trial, the State conceded that Norton was an accomplice. But the State argued that her testimony was corroborated both by Catina and the videotape. The State also argued that the trial court could take into consideration whether or not the accomplice’s testimony was unreasonable, self-contradictory, or substantially impeached. For support of the latter contention, the State cited to this Court’s decision in
 
 Clemons v. State,
 
 952 So.2d 314, 318 (¶ 12) (Miss.Ct.App.2007), wherein this Court, citing to
 
 Ballenger v. State,
 
 667 So.2d 1242, 1253 (Miss.1995), held that “[a] cautionary instruction is warranted when the testimony of an accomplice is ‘unreasonable, self contradictory or substantially impeached.’ ”
 

 ¶ 34.
 
 Williams
 
 overruled
 
 Clemons
 
 and all previous supreme court decisions to the extent they “suggest that accomplice testimony must be ‘unreasonable, self contradictory, or substantially impeached’ before a cautionary jury instruction is required!.]”
 
 Williams,
 
 32 So.3d at 491 (¶ 17).
 
 Williams
 
 explained that this is not the correct test for determining whether a cautionary instruction is warranted.
 
 Id.
 
 at 490-91 (¶¶ 15-16). And the court held that, in order “for a defendant to be entitled to a cautionary jury instruction, it is only necessary that the accomplice’s testimony be uncorroborated.”
 
 Id.
 
 at 491 (¶ 17).
 

 ¶ 35. Here, Norton’s testimony was corroborated by the testimony of Catina, who acted as a “confidential informant” for the State in this matter. We think it bears noting that Catina was not a typical confidential informant, in that Catina received no remuneration or special favors for her part in the investigation. Assuming such a factor makes no difference under
 
 Williams,
 
 we still find that there was no abuse of discretion in the trial court’s decision to deny proposed jury instruction D-4A-1. Both Norton’s testimony and Carina’s testimony were corroborated by the videotape. And the information contained on the videotape was the most damning evidence against the defendants. Accordingly, we find no merit to this issue.
 

 Y. Weight and Sufficiency of the Evidence
 

 ¶ 36. The defendants argue that the trial court erred by denying their joint
 
 *407
 
 motion for a directed verdict, motion for a judgment notwithstanding the verdict, and motion for a new trial. They contend that the State did not present sufficient evidence in its case against them to support a conviction of conspiracy to commit voter fraud. The defendants submit that the only evidence presented by the State to establish a conspiracy between the defendants was the conflicting testimony of alleged co-conspirator, Norton. They contend that despite Norton’s testimony at trial that she was selling votes on behalf of Moffitt, she was heard stating on the videotape that she did not know anything about vote buying and that all she did was carry people to the polls. They also contend that the State failed to present evidence to prove beyond a reasonable doubt that either defendant had intended for Norton to further the conspiracy, which the defendants maintain was never proven to have ever been formed. The defendants further argue that the jury’s verdict is so contrary to the weight of the credible evidence that to allow it to stand would result in a miscarriage of justice. Therefore, the trial court’s denial of said motions should either be reversed and rendered with an acquittal or remanded for a new trial.
 

 ¶ 37. “Motions for a directed verdict and a judgment notwithstanding the verdict challenge the legal sufficiency of the evidence, and the standard of review for a directed verdict and a judgment notwithstanding the verdict are identical.”
 
 Nelson v. State,
 
 10 So.3d 898, 905 (¶ 29) (Miss.2009). Because each challenge requires consideration of the evidence before the trial court when made, an appellate court reviews the ruling on the last occasion the challenge was made in the trial court.
 
 McClain v. State,
 
 625 So.2d 774, 778 (Miss.1993). Here, this occurred when the trial court denied the defendants’ joint motion for a judgment notwithstanding the verdict. Reversal of the trial court’s ruling can occur only when, “after viewing all the evidence in the light most favorable to the verdict, one or more of the elements of the charged offense is such that ‘reasonable and fair-minded jurors could only find the accused not guilty.’ ”
 
 Croft v. State,
 
 992 So.2d 1151, 1157 (¶ 24) (Miss.2008) (quoting
 
 Wetz v. State,
 
 503 So.2d 803, 808 (Miss.1987)).
 

 ¶ 38. A motion for a new trial, based on the weight of the evidence, will be successful only when the verdict “is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush v. State,
 
 895 So.2d 836, 844 (¶ 18) (Miss.2005) (citing
 
 Herring v. State,
 
 691 So.2d 948, 957 (Miss.1997)). The reviewing court first views all of the evidence in the light most favorable to the verdict.
 
 Id.
 
 If the evidence clearly preponderates against the verdict, the proper remedy is to vacate the verdict and order a new trial.
 
 Id.
 

 ¶ 39. In
 
 Griffin v. State,
 
 480 So.2d 1124, 1126 (Miss.1985), our supreme court defined criminal conspiracy as follows:
 

 Conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully, the persons agreeing in order to form the conspiracy. The offense is complete without showing an overt act in furtherance of the conspiracy.
 
 Norman v. State,
 
 381 So.2d 1024 (Miss.1980);
 
 Moore v. State,
 
 290 So.2d 603 (Miss.1974);
 
 Pickett v. State,
 
 139 Miss. 529, 104 So. 358 (1925).
 

 ¶ 40. The court went on to say:
 

 There must be recognition on the part of the conspirators that they are entering into a common plan and knowingly intend to further its common purpose.
 
 McDonald v. State,
 
 454 So.2d 488 (Miss.
 
 *408
 
 1984). If there is an agreement, then knowledge of that agreement follows. The agreement need not be formal or express[ed], but may be inferred from the circumstances, particularly by declarations, acts, and conduct of the alleged conspirators. The principle is stated in 16 Am.Jur.2d
 
 Conspiracy
 
 § 42 (1979), as follows:
 

 The trial court is allowed great discretion in the reception of circumstantial evidence, for conspiracy generally must be proved by a number of indefinite acts, conditions, and circumstances varying with the purpose to be accomplished. Where it is shown that the defendants by their acts pursued the same object, one performing one part and the other performing another part so as to complete it or the view to its attainment, the jury will be justified in concluding that they were engaged in a conspiracy to effect that object.
 

 Id.
 

 ¶ 41. In discussing what evidence will be allowed in to establish a conspiracy case, the
 
 Griffin
 
 court stated: “Admissible evidence in a conspiracy case covers a wide range[;][c]ommission of an offense is admissible as showing the conspiracy, since what the defendants actually did is evidence of what they intended to do.”
 
 Id.
 
 (citing
 
 King v. State,
 
 123 Miss. 532, 86 So. 339 (1920)).
 

 ¶ 42. Viewing the evidence in the light most favorable to the verdict, we find there was sufficient evidence to support the defendants’ convictions of conspiracy to commit voter fraud. Contrary to the defendants’ main contention on this issue, the State’s case did not rest solely on the testimony of Norton. There also was Cati-na’s testimony, as well as the videotape and what it revealed. A jury could reasonably infer from this evidence that the defendants knowingly and willingly entered into an agreement to commit voter fraud by procuring and seeking to influence the absentee votes of individuals by the payment of money.
 

 ¶ 43. Also, we find that the evidence does not preponderate so heavily against the verdict as to result in manifest injustice. Any discrepancies in the testimonies were for the jury to weigh and consider.
 

 ¶44. For these reasons, we find no merit with this issue.
 

 VI. Cumulative Error
 

 ¶ 45. The defendants contend that the cumulative effect of all the errors committed during trial, even if not reversible in themselves, combine to make up reversible error. Citing to
 
 Ross v. State,
 
 954 So.2d 968, 1018 (¶ 138) (Miss.2007), the defendants argue that the evidence in this case does not overwhelmingly support the jury’s finding of guilt in this case; therefore, this Court should be more inclined to view the cumulative errors in this case as prejudicial.
 
 Ross,
 
 a capital-murder case, held the following:
 

 The cumulative error doctrine stems from the doctrine of harmless error, codified under Mississippi Rule of Civil Procedure 61. It holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial.
 
 Byrom v. State,
 
 863 So.2d 836, 847 (Miss.2003). As an extension of the harmless error doctrine, prejudicial rulings or events that do not even rise to the level of harmless error will not be aggregated to find reversible error. As when considering whether individual errors are harmless or prejudicial, relevant factors to consider in evaluating a
 
 *409
 
 claim of cumulative error include whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged.
 
 See, e.g., Leonard v. State,
 
 114 Nev. 1196, 1216, 969 P.2d 288, 301 (Nev. 1998) (citing
 
 Homick v. State,
 
 112 Nev. 304, 316, 913 P.2d 1280, 1289 (1996)). That is, where there is not overwhelming evidence against a defendant, we are more inclined to view cumulative errors as prejudicial. In death penalty cases, all genuine doubts about the harmlessness of error must be resolved in favor of the accused because of the severity of the punishment.
 
 See Walker v. State,
 
 913 So.2d 198, 216 (Miss.2005).
 

 Id.
 

 ¶ 46. We do not find that the question of guilt to be close with either defendant in this case. As previously mentioned, more than sufficient evidence exists in the record to support the jury’s verdict that both defendants conspired to commit voter fraud. Finding no merit to any of the defendants’ arguments, we find no cumulative error. This issue is without merit.
 

 ¶ 47. THE JUDGMENT OF THE CIRCUIT COURT OF BENTON COUNTY OF CONVICTION OF ADA M. TUCKER OF CONSPIRACY TO COMMIT VOTER FRAUD AND SENTENCE OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH THE FIRST YEAR TO SERVE IN AN MDOC FACILITY AND THE SECOND YEAR UNDER HOUSE ARREST, WITH THREE YEARS OF POST-RELEASE SUPERVISION, AND TO PAY A $5,000 FINE, IS AFFIRMED.
 

 ¶ 48. THE JUDGMENT OF THE CIRCUIT COURT OF BENTON COUNTY OF CONVICTION OF CLINT MOF-FITT OF CONSPIRACY TO COMMIT VOTER FRAUD AND SENTENCE OF FIVE YEARS IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH THE FIRST TWO YEARS TO SERVE IN AN MDOC FACILITY AND THE THIRD YEAR UNDER HOUSE ARREST, WITH TWO YEARS OF POST-RELEASE SUPERVISION, AND TO PAY A $5,000 FINE, IS AFFIRMED.
 

 ¶ 49. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL,
 
 33.,
 
 CONCUR.
 

 [1]
 

 . The record indicates that Norton was referring to Orman, Moffitt's father-in-law. Norton also indicated that Orman was her boss, but she did not state in what capacity.